UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DAVID P. ESPOSITO

*Plaintiff,*

vs.

C.A. No. 04-302 S

TOWN OF NORTH PROVIDENCE, by and through it's Finance Director ROBERT DISTEFANO, ET AL

*Defendants.*

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COME Defendants and hereby move for the entry of summary judgment on all counts. In support thereof, defendants rely upon the Memorandum of Law and Rule 12.1 Statement of Undisputed Facts, attached and incorporated herein.

Defendants,
By their attorneys,

Marc DeSisto, Esq. (#2757)
Kathleen M. Daniels, (#4766)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
(401) 272-4442
(401) 272-9937 facsimile
marc@desistolaw.com
kathleen@desistolaw.com

CERTIFICATION OF SERVICE

I hereby certify that a true and accurate copy of the within Motion was mailed, postage prepaid, on this 1st day of November, 2005 to:

Joseph P. Casale, Esq. (#3653)
438 East Main Road
Middletown, RI 02842
Phone: (401) 841-0004
Fax: (401) 841-0016

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DAVID P. ESPOSITO<br><br>*Plaintiff,*<br><br>vs.<br><br>TOWN OF NORTH PROVIDENCE, by and through it's Finance Director ROBERT DISTEFANO, et al.,<br><br>*Defendants.* | C.A. No. 04-302 S |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### *I. INTRODUCTION*

Plaintiff comes before this Court seeking to recover for what he views as ten (10) years of harassment allegedly resulting in the deprivation of plaintiff's right to due process, discrimination in violation of the Americans with Disabilities Act ("ADA") and the intentional infliction of emotional distress. Defendants submit that in addition to the fact that the majority of plaintiff's claims are barred by the statute of limitations, the claims that are not time-barred fail to amount to a recognizable claim under the due process clause, the ADA or Rhode Island tort law. Summary judgment on all counts should accordingly be granted.

### *II. BACKGROUND FACTS*

Plaintiff is the Crime Prevention Officer (CPO) for the Town of North Providence In 1990, the CPO position was the subject of an arbitration dispute between plaintiff's union, Local 1033 and the police officers' union, with both unions claiming the right to name one of its members to the position. Part of this dispute surrounded the job description and job qualifications of the position. After hearing it was ultimately determined that the position should

be filled by a Local 1033 member. However, the issue of the job description as well as job qualifications was left open. After a subsequent grievance surrounding plaintiff's qualifications for the position, the Town was directed to appoint plaintiff as the CPO by the 1993 Order of an Arbitrator.

As a member of Local 1033, Plaintiff possesses grievance rights under Local 1033's Collective Bargaining Agreement with the Town. *Deposition of Plaintiff (hereinafter "Depo.") (September 8, 2005) at 28 (excerpted pages attached Exhibit A).* In fact, since he began his employment with the Town, plaintiff has filed a number of grievances challenging all aspects of his position including one challenging the Town's alleged denial of his right to perform the job as outlined in the disputed job description. *Depo. at 31.* This grievance, which was filed in July 1994 and decided by an arbitrator in November 1999, is currently on appeal before the Superior Court.

The majority of actions plaintiff relies on to support his claims occurred from 1994 to 2001. *Plaintiff's Complaint; Depo. at 34.* In fact, most of these actions were the topic of past grievances or workers' compensation claims. *Depo. at 34.* Plaintiff claims that since November 2001 he has been harassed by the continued failure of the Town to give him assignments that he thought fell under the job description of CPO, rigid treatment after filing a grievance, being administratively disciplined on at least two (2) occasions, having a desk at the Division of Inspections rather than the police department, being told to punch in and out for breaks, being reduced to half-hour lunch, and despite knowing of allergies, placing him in office that could possibly exacerbate his condition. *Id. at 32-33.* Plaintiff concedes that all of these acts were grievable offenses and, as noted, he did file grievances challenging each act. *Id. at 34.* Two (2) such grievances surrounding administrative discipline were resolved by a stipulated agreement between the parties. *Id. at 37-38 & 43-44.*

The only actions that plaintiff does not consider to be covered by the Collective Bargaining Agreement are the general feeling of hostility and lack of respect for his position that he felt were displayed by patrol officers through certain statements.[1] *Id. at 34.* However, according to plaintiff, most of these alleged harassing statements occurred between 1994 and 2001. *Id.*

Plaintiff also claims to suffer from severe allergies. *Id. at 14.* The symptoms he experiences include runny nose, watery eyes, congestion, headaches, sore throat all of which are alleviated by daily doses of Allegra. *Id. at 16, 18.* Plaintiff alleges in his Complaint that his allergies, exacerbated by the defendants relocating him to poorly ventilated areas, forced him out of work from March 1996 to September 1998 and again from March 1999 through September 2001. *Plaintiff's Complaint, at ¶¶ 45 & 47.* Plaintiff filed workers' compensation claims for both periods of time seeking to recover for both physical and psychological disability. A stipulated agreement was entered for the 1996-1998 time out of work for physical ailments. *Depo. at 4-6.* Plaintiff however, lost both his claim for psychological injuries as well as his claim for all benefits for the 1999-2001 time period. *Id. at 5 & 13.*

On cross-examination by his attorney, plaintiff stated that his desk assignment from 1996 – 1999 in a basement office caused "consistent sinusitis" that affected his ordinary life and required him to pursue workers' compensation. However, on direct examination, plaintiff denied on that these conditions prevented him from performing everyday tasks. *Depo. at 19-26.* Plaintiff also admitted that his allergies do not prevent him from working in a well-ventilated areas. Plaintiff does not allege to have suffered such "consistent sinusitis" since 2001.

---

[1] Plaintiff noted that one time a patrol officer questioned whether plaintiff was qualified to wear a jacket with a police department insignia. *Depo. at 35.* He said he also received comments by some patrol officers to the effect that he had been there longer than them but they were allowed to do more things than plaintiff. *Depo. at 34.*

## *III. Standard Of Review*

Under the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c).* It is axiomatic that this Court must view the evidence in the light most favorable to the nonmoving party. *Morrissey v. Boston Five Cents Savings Bank, F.S.B., 54 F.3d 27, 31 (1st Cir. 1995).* However, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleadings, but . . . must set forth the specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e).* "A fact is 'material' if it potentially could affect the suit's outcome. An issue concerning such a fact is 'genuine' if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Cortes-Iriszarry v. Corporacion Insular DeSeguros, 111 F.3d 184, 187 (1st Cir. 1997) (citations omitted).*

Accordingly, the purpose of summary judgment is to permit the court "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required" on the claims being examined. *Wynne v. Tufts Univ. School of Medicine, 976 F.2d 791, 793-94 (1st Cir. 1992) cert. denied 113 S.Ct. 1845 (1993).* The mandates of Rule 56(c) requires entry of summary judgment "upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).*

## *IV. ARGUMENT*

### A. The Statute of Limitations Bars the Majority of Plaintiff's Claims.

According to plaintiff's Complaint, and as more fully demonstrated by plaintiff's deposition testimony, plaintiff has filed the instant Complaint seeking to recover for incidents and/or actions that occurred from 1994 through to the present. Defendants submit that partial summary judgment on any and all claims arising before November 2001 (more than three (3) years before the filing of the instant complaint) should be granted in that the statute of limitations on such claims has passed.

As noted, plaintiff has filed a claim under *§ 1983,* the ADA, and a state law claim for intentional infliction of emotional distress. Under applicable law, the statute of limitations for all these claims is three (3) years; the statute of limitations for personal injury actions in Rhode Island. See Nieves-Marquez v. Puerto Rico, *353 F.3d 108, 118-119 (1st Cir. 2003) citing* Wilson v. Garcia, *471 U.S. 261 (1985) (§ 1983 claims are subject to the State statute of limitations for personal injury actions) and* Gaona v. Town & Country Credit, *324 F.3d 1050, 1055-56 (8th Cir. 2003) (ADA and Rehabilitation Act); and R.I.G.L. § 9-1-14. Accord* Goldstein v. Harvard Univ., *77 Fed. Appx. 534, 536 (1st Cir. 2003).* The instant Complaint was filed on November 6, 2001. Accordingly, any actions prior to November 6, 2001, are time barred and summary judgment on any such incidents should be granted.

### B. Defendants Are Entitled to Summary Judgment on Plaintiff's Claim For An Alleged Violation of the American with Disabilities Act, Count II.

#### *1. Plaintiff has failed to exhaust her administrative remedies.*

Defendants first submit that plaintiff's claim under the ADA must fail because plaintiff has failed to exhaust his administrative remedies. The First Circuit has held "that the ADA mandates compliance with the administrative procedures specified in Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, and that, absent special circumstances . . . such compliance must occur before a federal court may entertain a suit that seeks recovery for an alleged violation of Title I of the ADA." Bonilla v. Muebles J.J. Alvarez, Inc., *194 F.3d 275, 277 (1st Cir. 1999).*

In the instant case, plaintiff did not file a timely claim with the Equal Employment Opportunity Commission (EEOC) or an equivalent state agency within the requisite time period prior to filing the instant suit. Consequently, "[t]his omission . . . bars the courthouse door, as courts long have recognized that Title VII's charge-filing requirement is a prerequisite to the commencement of suit." *Id. at 278.* Summary judgment on Count II, plaintiff's claim under the ADA accordingly should enter in favor of defendants.

***2. Plaintiff is not "disabled" under the American with Disabilities Act.***

Defendants alternatively submit that even if plaintiff had filed a timely EEOC complaint, summary judgment on Count II should nevertheless enter because plaintiff's claimed impairment does not amount to a protected disability under the ADA. In the instant case, plaintiff cites to "severe allergies" as the medical condition giving rise to his claim under the ADA. *Deposition, at 14.* Defendants submit that in the instant case, as a matter of law, plaintiff's claimed medical condition does not support a finding of a disability subject to protection under the ADA.

By its express terms, the ADA requires certain employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." *42 U.S.C. § 12112(b)(5)(A) (1994 ed.).* The Act defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the

employment position that such individual holds or desires." *42 U.S.C. § 12111(8).* In turn, a "disability" is:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

*42 U.S.C. § 12102(2).*

Thus, the first step in analyzing a claim under the ADA is a determination of whether the claimant suffers from a "physical or mental impairment." *Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184, 195 (U.S. 2002).* However, as is apparent from the face of the statute and reiterated by the U.S. Supreme Court, "merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." *Id. citing 42 U.S.C. § 12102(2)(A) (1994 ed.).* The limitation on the major life activity in turn must be substantial. *Id.*

Thus, "the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience .. is substantial.'" *Id. at 198 quoting Albertson's Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999). See also 42 U.S.C. § 12102(2)(A).* As defined by the Supreme Court, the tem "substantial" precludes impairments that interfere in only a minor way with the performance of a major life activity. *Id. at 196.*

In addition, any determination as to whether an individual is disabled should be made in reference to any measures that mitigate the individual's impairment. *Sutton v. United Air Lines, 527 U.S. 471, 482-483 (U.S. 1999).* As such, a person whose physical or mental impairment is

corrected by medication or other mitigating measures cannot be considered to have an impairment that substantially limits a major life activity. Id.

In the instant case, plaintiff's own testimony negates any claim that his alleged medical impairment substantially affects any major life activity. According to plaintiff, when he is exposed to any of a host of allergens, he suffers a variety of symptoms that includes runny nose, nosebleeds, congestion watery eyes, headaches and sore throat. *Depo. at 16.* Nevertheless, plaintiff further concedes that these symptoms do not substantially interfere with his ability to carry on with major life activities. *Id. at 18-21, 25-26.* Other Courts that have addressed similar claims that severe allergies amounted to a disability under the ADA, have likewise rejected such a finding based on the conclusion that the impairment does not substantially affect a major life activity. See *i.e.* *Emery v. Caravan of Dreams, Inc., 879 F.Supp. 640, 642-43 (N.D. Tex. 1995) (Plaintiff suffering from asthma and allergies to tobacco, ragweed, pollen, and dust mites not "person with disability" under ADA where testimony showed plaintiff not substantially impaired in ability to work, recreate, breathe or have normal life); Land v. Baptist Med. Ctr., 164 F.3d 423, 425 (8th Cir. 1999) (concluding plaintiff's allergy did not substantially limit her ability to eat or breathe--major life activities).*

Moreover, plaintiff also admitted that although his allergies are affected by damp, moldy conditions, by taking daily doses of medication, he is able to mitigate the symptoms such to allow him to work. *Depo. at 17, l. 11-13; p. 18, l. 13-17; p. 21, l. 17-21; p. 22, 17-15.* As found by the Courts, such an ability to mitigate the physical impairment negates a claim of disability under the ADA. *Sutton, 527 U.S. at 482-483; Gallagher v. Sunrise Assisted Living, 268 F. Supp. 2d 436, 441 (D. Pa. 2003) (By plaintiff's own admission, the use of medications decreased any limitation Plaintiff's allergies place on her breathing).*

Plaintiff's own testimony thus makes clear that his claimed medical impairment, although limiting where he may work (places with good ventilation), does not substantially impair a major life activity. *Depo. at 24-25.*[2] According to plaintiff, other than the time period when his office was in the basement (1996-1999), *Id. at 72-73,* he was able to carry on with everyday activities including working out, caring for himself and working, *Id. at 24-25*. Those courts that have addressed a claim similar to plaintiff, that is location specific limitations, have uniformly held that such a limitation does not amount to a substantial interference with a major life activity. For example, the plaintiff in *Block v. Rockford Pub. Sch. Dist. # 205, 2002 U.S. Dist. LEXIS 24480, 7-8 (D. Ill. 2002),* claimed to be disabled under the ADA by virtue of suffering from asthma and allergies. The Court held that plaintiff had failed to show that her asthma and allergies substantially affected a major life activity despite the fact that her medical condition prevented her from attending classes in a particular school due to poor ventilation in the classrooms. Such a "location specific limitation was not a substantial limitation on a major life activity." *Id.* The plaintiff in *Heilweil v. Mt. Sinai Hosp., 32 F.3d 718 (2nd Cir. 1994) cert. denied, 513 U.S. 1147 (1995),* whose asthmatic condition prevented her from working in a certain room of the hospital, likewise failed to demonstrate a substantial limitation on a major life activity. The plaintiff in *Heilweil* claimed that the ventilation system in the room made her asthma much worse. *Id. at 719.* However, because the evidence did not show she was unable to work anywhere else, the Second Circuit rejected the plaintiff's claim of a disability under the ADA. *Id.*

Similarly, in the instant case, the most the plaintiff can claim regarding his medical condition is that it interferes with working in certain locations. By plaintiff's own admission, his condition does not prevent him from working anywhere else. *Depo. at 24-25.* Consequently,

[2] Plaintiff's attorney preserved objections to this line of questioning.

plaintiff fails to demonstrate a "disability" subject to protection under the ADA and summary judgment on Count II should accordingly enter in favor of defendants.

**C. Summary Judgment on Count I, § 1983 Due Process Claim Should Also Enter in Favor of Defendants.**

In Count I, plaintiff has also brought a claim for the alleged violation of his right due process. As recently explained by the First Circuit, "[t]he Due Process Clause has both procedural and substantive components. In its procedural aspect, due process ensures that government, when dealing with private persons, will use fair procedures. In its substantive aspect, due process safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them." *DePoutot v. Raffaelly, 424 F.3d 112 (1st Cir. 2005).* Plaintiff does not identify in his Complaint whether he is seeking to maintain a claim under the procedural or substantive due process clause of the Fourteenth Amendment. Nevertheless, defendants submit that summary judgment should enter regardless of whether Count I seeks to maintain a procedural or substantive due process claim.

In order to state a *§ 1983* claim for procedural due process claim, plaintiff must show (i) that he has a constitutionally protected property interest, and (ii) that he has been deprived of that interest by state action. *Board of Regents v. Roth, 408 U.S. 564 569-70 (1972).* The Supreme Court has also attached "critical importance . . . to the requirement that a procedural due process claimant allege the unavailability of constitutionally-adequate remedies under state law." *Rumford Pharmacy, Inc. v. East Providence, 970 F.2d 996, 999 (1st Cir. 1992).*

> to determine whether a [procedural due process] violation has occurred, it is necessary to ask what process the State provided, and whether it is constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation provided by state or tort law.

*Id. quoting Zinermon v. Burch, 494 U.S. 113, 125-126 (1990).*

In the instant case, defendants submit that plaintiff has failed to demonstrate, or even allege, that he lacks an adequate state law remedy. In fact, the grievance procedure outlined in Plaintiff's Collective Bargaining Agreement specifically provides plaintiff with a review process. Courts have routinely found that such grievance procedures are constitutionally adequate. *See i.e. Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 102 (1st Cir. 2002) (the full arbitration hearing afforded by the collective-bargaining agreement was more than sufficient to satisfy the requirement for a post-deprivation hearing); O'Neill v. Baker, 210 F.3d 41, 49 (1st Cir. 2000) (holding that arbitration of public employee's termination grievance satisfies the requirements of due process).* In the instant case, plaintiff conceded that other than the occasional comment by patrol officers, all of his complaints against the Town were not only grievable offenses but that he in fact exercised his rights under the CBA. *Depo. at 34.* One such grievance, which involves the major contention raised by the instant Complaint, that the defendants denied him the right to perform his duties as CPO, is still on appeal before the Superior Court. Thus, to the extent that plaintiff is raising a procedural due process claim, summary judgment in favor of the defendants should enter because plaintiff has failed to allege or demonstrate the lack of an adequate state law remedy.

Contrary to a procedural due claim which focuses on the procedural protections afforded to a deprivation, "a substantive due process claim implicates the essences of state action rather than it modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible." *Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990) cert. denied, 498 U.S. 936.* In asserting a protected interest under the substantive due process clause, plaintiff cannot rely on procedural due process jurisprudence. *Santiago de Castro v. Morales-Medina, 943 F.2d 129, 131 (1st Cir.*

*1991).* This is because "substantive due process rights are created only by the Constitution." Regents of Univ. of Michigan v. Ewing, *474 U.S. 214, 229 (1985) (Powell, J. concurring).*

As recently explained by the First Circuit, the threshold question under a claimed substantive due process claim is whether the alleged "abuse of power practiced by the executive branch of state government [was]. . . .so extreme and egregious as to shock the contemporary conscience. DePoutot, *424 F.3d 112, 2005 U.S. App. LEXIS at *13.* If that question is answered in the affirmative, the Court will then "examine what, if any, constitutional right may have been violated by the conscience-shocking conduct and identify the level of protection afforded to that right by the Due Process Clause." *Id.*

In determining whether the challenged action "shocks the conscience" the Court must look beyond whether the plaintiff claims to have been caused "some harm" by an individual cloaked with state authority or has been denied "due care" by a government official. County of Sacramento v. Lewis, *523 U.S. 833, 848-49* (1998).

> Consistent with these principles, [the First Circuit has] stated that 'the requisite arbitrariness and caprice' for a conscience-shocking executive action 'must be stunning, evidencing more than humdrum legal error.' Mere violations of state law, even violations resulting from bad faith, do not necessarily amount to unconstitutional deprivations of substantive due process. Courts regularly have required something more egregious and more extreme. DePoutot, *424 F.3d 112, 2005 U.S. App. LEXIS at *14-15 quoting* Amsden, *904 F.2d at 754 n.5 & 757.*

In the instant case, plaintiff claims that his substantive due process rights have been violated by the alleged acts of harassment that include the failure to allow plaintiff to perform his claimed job functions, placing his desk in an undesirable area and through the comments directed towards him by police personnel. Defendants submit that as a matter of law, even accepting the veracity of plaintiff's claims, these actions are not so "extreme, egregious or outrageously offensive as to shock the contemporary conscience." *Id. Compare* Cruz-Erazo v. Rivera-Montanez, *212 F.3d 617, 623 (1st Cir. 2000) (holding that harassment by police officers*

*including unlawful arrests over time to protect officer illegally living in plaintiff's house did not shock the conscience because it was not physically intrusive or violent, nor did it strike at any protected relationship, such as between a parent and child);* Pittsley v. Warish, *927 F.2d 3 (1st Cir. 1991) (although "despicable and wrongful" harassment including threats to kill children's father, conduct did not rise to the level of a constitutional violation).* Absent a basis to find that the defendants' actions "shock the conscience," as that term is defined under the substantive due process clause, summary judgment on Count I should enter in favor of defendants.[3]

Defendants further submit that even if plaintiff's claims satisfied this threshold "shock the conscience" requirement, the instant complaint fails to state an "identifiable liberty or property interests" actionable under the substantive modality of the due process clause. Under well-settled precedent, such recognizable interests "generally have something to do with 'matters relating to marriage, family, procreation, and the right to bodily integrity' rather than property or employment issues." Ramirez v. Arlequin, *2005 U.S. Dist. LEXIS 3380, 30-31 (D.P.R., 2005).* Michael H. v. Gerald D., *491 U.S. 110, 122 (1989)(substantive due process "affords only those protections 'so rooted in the traditions and conscience of our people as to be ranked as fundamental").* See i.e. Harrington v. Almy, *977 F.2d 37, 43 (1st Cir., 1992) ("substantive due process analysis [has] focused on state action undertaking unwanted manipulations of an individual's body");* Rochin v. California, *342 U.S. 165, 172 (1952) (holding that pumping a criminal defendant's stomach shocked the conscience);* Cruz-Erazo, *212 F.3d at 623;* Souza v. Pina, *53 F.3d 423, 427 (1st Cir. 1995 (holding that prosecutor's statements to media linking the plaintiff to the murder of nine women did not shock the conscience).* Justice Scalia was

---

[3] As more fully described *infra*, at section IV, C., plaintiff's concessions regarding job placement and functions during the pendency of the grievance further negate any claim of conscience shocking behavior.

especially critical of the reliance upon substantive due process protections for non-fundamental constitutional rights: "It would be absurd to think that all "arbitrary and capricious" government action violates substantive due process . . . . The judicially created substantive component of the Due Process Clause protects, we have said, certain "fundamental liberty interests" from deprivation by the government, unless the infringement is narrowly tailored to serve a compelling state interest." City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., *538 U.S. 188, 200 (2003) (Scalia, J. concurring).*

In the instant case, plaintiff's claimed interest, his employment position, simply does not amount to a matter "relating to marriage, family, procreation, and the right to bodily integrity." Ramirez, *2005 U.S. Dist. LEXIS 3380 at 30-31.* Thus, in addition to the fact that as a matter of law plaintiff has failed to demonstrate conscience shocking activity, plaintiff's substantive due process claim must nevertheless fail because plaintiff has failed to identify a constitutional right protected under the substantive due process clause of the Fourteenth Amendment. Summary judgment on Count I should accordingly enter in favor of defendants.

**D. Plaintiff Has Failed To Demonstrate Extreme and Outrageous Conduct To Meet Intentional Infliction of Emotional Distress.**

In Count III, plaintiff alleges that the defendants' actions amounted to the intentional infliction of emotional distress. In recognizing the tort of intentional infliction of emotional distress, the Rhode Island Supreme Court has generally followed the Restatement (Second) on Torts. *Curtis v. State Department Children and their Families, 522 A.2d 203, 208 (R.I. 1987); Champlin v. Washington Trust Co., 478 A.2d 985, 989 (R.I. 1984).* Thus, under Rhode Island law, in order to maintain an action for intentional infliction of emotional harm:

> (1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the

emotional distress, and (4) the emotional distress in question must be severe. *Champlin, 478 A.2d at 989.*

In addition, the Rhode Island Supreme Court has recognized the subjective nature of such claims for emotional distress and the possible hardship imposed on defendants in attempts to defend such claims. Thus, in order to maintain a claim for the intentional infliction of emotional distress, the plaintiff must also provide at least some proof of medically established physical symptomatology. *Curtis, 522 A.2d at 208; Champlin, 478 A.2d at 989.*

In the instant case, defendants submit that summary judgment should enter because plaintiffs have failed to demonstrate that the defendants' actions amounted to "extreme and outrageous" conduct such to justify recovery. The issue of whether conduct is sufficiently "extreme and outrageous" to satisfy this standard, in the first instance, is one of law for the Court. *Fudge v. Penthouse International, Ltd., 840 F.2d 1012, 1021, cert. denied, 488 U.S. 821 (1988); Elias v. Youngken, 493 A.2d 158, 164 (R.I. 1985); Champlin, 478 A.2d at 990.* The Second Restatement explains that:

> [i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability. *Restatement (Second) of Torts (1965), § 46, at comment (h).*

The "extreme and outrageous" standard has been described as an amorphous standard that necessarily varies from case to case. *Russell v. Salve Regina College, 890 F.2d 484, 488 (R.I. 1989), reversed and remanded on different ground, 499 U.S. 225.* The Restatement (Second) of Torts has thus provided guidance by cautioning that:

> it [is] not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Restatement (Second) of Torts (1965), § 46, comment (d).*

Courts therefore have rejected the notion that intentional or reckless conduct that causes severe emotional distress ipso facto constitutes extreme and outrageous conduct. *Fudge, 840 F.2d at 1021.* Rather, in order to meet the "extreme and outrageous" standard, a plaintiff must demonstrate that the defendant's conduct:

> has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim "Outrageous." *Restatement (Second) of Torts (1965), § 46, comment (d).*

*See also Swerdlick v. Koch, 721 A.2d 849, 863 (R.I. 1998).*

In the instant case, the conduct since 2001 that plaintiff lists to support his claim for the intentional infliction of emotional distress includes the failure of the Town to give him assignments that he thought fell under the job description of CPO, "rigid treatment" after filing a grievance, being administratively disciplined on at least two (2) occasions, having desk at the Division of Inspections rather than the police department, being told to punch in and out for breaks, being reduced to half-hour lunch, and despite knowing of allergies, placing him in office that could possibly exacerbate his condition. *Depo. at 32-33.* Review of these incidents reveals that they fall far short of amounting to extreme and outrageous conduct necessary for a finding of intentional infliction of emotional distress.

In the first instance, the alleged failure to provide plaintiff with assignments plaintiff believes fall within his job description is a pending issue in the grievance before the Superior Court. In addition, according to plaintiff, because of the pending grievance, he reached an agreement with the Town in 2002 that he would move over to the Division of Inspections and write grants "until a suitable job description was negotiated or arbitrations were done {sic}or some kind of ruling." *Id. at 62.* Such an agreement thus nullifies plaintiff's claim that the

defendants acted extremely and outrageously by placing plaintiff's desk in the division of inspection (the place plaintiff claims to have exacerbated his allergies). *Id. at 61-63.* Plaintiff's allegations that the administrative discipline amounted to extreme and outrageous conduct also falls in the face of plaintiff's agreements to resolve those disciplinary actions short of determination regarding the propriety of the same.[4] *Id. at 37 & 43-44.*

Plaintiff's own actions in resolving his disputes and in particular agreeing to his placement at the Division of Inspection pending a determination of his actual duties and/or resolution of the arbitration proceeding, thus negates the conclusion that the defendants' actions were extreme or outrageous. Rather, the only remaining claims of extreme and outrageous conduct are the reduction of plaintiff's lunch time and requiring that plaintiff punch in and out for breaks.[5] As a matter of law, these actions fall far short of being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Restatement (Second) of Torts (1965), § 46, comment (d).* Consequently, summary judgment, as a matter of law, on Count III, the claim for intentional infliction of emotional distress should enter in favor of defendants.

## *V. CONCLUSION*

For the reasons cited herein, as well as those that may be raised at hearing, defendants respectfully request that summary judgment on all counts be entered in favor of defendants.

---

[4] In fact, although plaintiff was not entirely clear, it appears that he resolved the first administrative suspension by agreeing to forfeit ten (10) days pay. *Depo. at 38-39.* In addition, the second disciplinary action was resolved with the agreement that the charges would be held in abeyance for a year subject to no further incidents by plaintiff during that time. *Id. at 43-44.*

[5] Plaintiff testified at his deposition that he filed grievances challenging these actions as well. *Id. at 34.* It is unclear whether or how these grievances were resolved.

Defendants,
By their attorneys,

Marc DeSisto, Esq. (#2757)
Kathleen M. Daniels, (#4766)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
(401) 272-4442
(401) 272-9937 facsimile
marc@desistolaw.com
kathleen@desistolaw.com

CERTIFICATION OF SERVICE

I hereby certify that a true and accurate copy of the within Memorandum was mailed, postage prepaid, on this 1st day of November, 2005 to:

Joseph P. Casale, Esq. (#3653)
438 East Main Road
Middletown, RI 02842
Phone: (401) 841-0004
Fax: (401) 841-0016

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DAVID P. ESPOSITO

VS C.A. NO. 04-302 S

TOWN OR NORTH PROVIDENCE, by and through it's Finance Director ROBERT DISTEFANO and its agents, MAYOR A. RALPH MOLLIS, JOHN FLEMING, ERNEST C. SPAZIANO, G. RICHARD FOSSA, WILLIAM V. DEVINE, JOSEPH DICENZO, LEO J. PERROTTA AND WILLIAM ABBATEMATEO

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

D-E-P-O-S-I-T-I-O-N

DEPOSITION of DAVID P. ESPOSITO, taken in the above-entitled cause on behalf of the Defendants, pursuant to notice, before Brenda A. Scharver, Notary Public in and for the State of Rhode Island, at the offices of DeSisto Law, 211 Angell Street, Providence, Rhode Island on September 8, 2005 scheduled for 10:00 a.m.

APPEARANCES:

FOR THE PLAINTIFF:
JOSEPH P. CASALE, ESQ.

FOR THE DEFENDANTS:
DeSISTO LAW
MARC DeSISTO, ESQ.

DAVID ESPOSITO
(Being duly sworn testifies as follows:)

DIRECT EXAMINATION BY MR. DeSISTO:

Q Can I have your full name for the record?
A David Patrick Esposito.
Q Mr. Esposito, we've met before, and you realize that I represent the Defendants in this matter?
A Yes.
Q Have you ever been deposed before?
A No.
Q I know that your attorney has filled you in on what a deposition is so I'm not going to go over that. I'm going to tell you in advance what I'm going to ask you so that you'll know as it's coming up. We're going to start with some background questions, then move to your claims of damage, and then I want to talk about things that happened on the job that you made complaints about, and that will be it. I don't think it's going to take more than a couple of hours, probably less; okay?
A Okay.
Q Let's start with background. What is your date of birth?
A My birth date is 3/17/56.
Q Where do you live right now?







A I live at 17 Crescent Drive, North Providence, Rhode Island.
Q Who do you live with?
A I live alone.
Q How long have you lived there?
A Twenty years.
Q Have you ever been married?
A No.
Q What is your educational background?
A I went to high school, North Providence and Lasalle Academy. I went to College at Rhode Island College. I have a BA from Rhode Island College. I also attended Providence College for a few courses. I have a legal assistant degree from the University of Bridgeport, associate in arts degree. And I have jurist doctor degree from Southern New England School of Law.
Q When did you graduate from the Southern New England School of Law?
A Technically it was September 2000.
Q Is that accredited?
A It's Massachusetts State accredited, but not ABA. They tried to get ABA.
Q Have you taken any bar?
A No -- well, I haven't -- I've taken Mass.







Q Did you pass the Massachusetts?
A No.
Q You only took it once?
A I took it a couple of times.
Q Have you ever been involved in a suit before either as a plaintiff or a defendant?
A Not a suit. Like arbitrations, are you considering that?
Q Excluding arbitrations. I mean an actual court suit?
A No.
Q You have filed some worker's comp actions?
A Can I go back to that other answer?
Q Sure.
A There was involvement with the union in a case regarding this matter.
Q I was more looking for a suit where you were either named as a defendant or you were named as a plaintiff?
A No, the answer would be no.
Q Have you filed worker's comp actions?
A Yes.
Q How many?
A There was one, I filed one worker's comp action with double claims.
Q When did you file it, just the year?
A '96.







Q What were the two claims?
A One was physical injury related to the job and the other one was psychological injury.
Q Related to the job?
A Related to the job.
Q That's the job you hold now?
A Crime prevention officer, yes.
Q What happened to each of those claims?
A I received worker's compensation for the physical injury. The psychological injury went on, and I didn't, I wasn't successful in the psychological injury part of the case.
Q But in the physical part of the case you were successful?
A I was being paid.
Q Did you receive an ultimate award as a result of the worker's comp action?
A I believe it was a stipulated award.
Q How much was it?
A It was paid on time from '96 to '98.
Q Ultimately on the physical claim was it found by the worker's comp commission that it had substance, that you were right?
A We went to hearing, but I know there was an agreement. I don't know if it was a final judgement from the court itself or it was just a stipulated agreement but I did

get paid.
Q So I can safely say that you and the Town of North Providence agreed on something and they paid you some money?
A Correct.
Q Did you prepare for this deposition in any way?
A Only being prepared of what generally it was.
Q With counsel?
A With counsel.
Q Don't get offended, I ask everyone this: Have you ever been arrested before?
A No.
Q And I ask everyone this also: Do you have any audio tapes or video tapes of anything that relates to this matter?
A No. There was -- it's not a tape. It was -- there was a tape in regard to the substance of the job that was used in an arbitration, but I don't, it's nothing I did or produced. It was something that the Town did as one of the crime prevention, deals with the crime prevention people.
Q Never the less, do you have a copy of that tape?
A I don't. It was given in arbitration as evidence.
Q Do you keep a diary or a log of things as they happen,







today such and such happened?
A I do if there was something that I felt needed to be written down.
Q And so do you have any diary entries or log entries concerning any matter that's in the Complaint?
A Only those that might pertain to the arbitration, that I used in the arbitration as evidence.
Q And where are those diary or entries, log entries now?
A My lawyer, lawyer that represented the union would have them in his possession.
Q You don't have copies?
A My copies I don't have right now.
Q When you say "right now", where are they?
A I don't have them. My lawyer has them and I gave some to counsel.
Q So you don't have any in your possession, but Mr. Casale has some?
A Yes.
Q When is the last time you looked at those?
A When I -- a long time, '99 for the hearing.
Q Is it one or two pages or is it a substantial amount? Just give me an idea of how many diary entries you have?
A There might be quite a few because it encompassed several years at the Town, from like '95 and '96, those kind of







things.
Q Would you write things down as they occurred, like today so and so spoke to me and said this and that?
A Yes. And those were all exhibits in the arbitration, part of the arbitration.
Q I keep saying diary or logs. I also mean notes. Is it the same answer, you don't have separate notes of this, do you?
A Well, I don't keep a diary. They were just notes. If something occurred, that particular time I would write it down.

MR. DeSISTO: I'm going to mark as an exhibit the Complaint because I want to ask you a couple of questions about it. I think it will be easier that way.

(Whereupon; Complaint marked Defendant's Exhibit A for Identification.)

Q I want you to turn to Paragraph 46, it's on Page 6. I'll read it out loud, and then if you need to read some of the other paragraphs in the Complaint to get a context of what it is, feel free to do so. But 46 says, "that due to this activity by the Defendants, Plaintiff lost almost half his wages and has never been repaid by the Defendant Town." Can you explain what that refers to?







A Yeah, that would be I guess a combination of the time that I was out on worker's comp where I lost that part of my income, and I would believe my understanding, my understanding of this is the time that I was out from after '99. So it was, I believe it was around my birthday, around March '99 to 2001 when I went back.
Q I just want to make sure we're not confused. The reason I brought it up is because the preceding Paragraph 45 talks about a time period of March '96 to September of '98 when you were out on worker's comp. And then the next one talks about losing half of your wages.
Do you think you lost your wages in 1999 and that's what that paragraph refers to?
A I think that's referring to the worker's comp where you get a portion of your wages which is almost half your wages, it's probably inferring to the other period of time as well where I lost all of my wages.
Q The reason I bring it up is because you just indicated that you settled with the Town on the worker's comp action.
So you agree that if you entered into a settlement with them, then you wouldn't be entitled to anything for the time period of that worker's comp action; correct.

MR. CASALE: Objection. You may answer.

A Well, I'm not really sure legally whether I'm entitled to more.
Q I just want to make sure of a couple things. You did settle with the Town so that you and the Town agreed on a figure that you would get for worker's comp; correct?
A Periodic payment from worker's comp. There was no finalized time or ending to the amount of payments or number of payments until I was called back to work. There was no final sum.
Q I don't want to spend a lot of time on this, but didn't you agree with the Town to resolve your worker's comp action so that they agreed to a figure, you agreed to a figure; didn't that happen?
A The agreement was to be paid worker's comp, whatever that figure was according to statute, get that for a period of time until there was a resolution.
Q Resolution of what?
A Suitable employment.
Q Was this agreement with the Town written in any form?
A I believe I did see an Order from the court signed by both parties.
Q Did you sign anything?
A I didn't. I don't recall signing.
Q So when 46 says "you lost half of your wages", what







figure is that?
A Well, it says "almost half of my wages", and I believe what that means is again the amount paid through whatever the worker's comp statute, which frankly I don't know what the amount is, compared to my salary is what that means, and I didn't get my whole salary; therefore, I lost almost half my salary.
Q Just give me the period of time where this occurred, then I can figure out what monetary amount you're claiming?
A That would be from '96, March '96 to September '98 that specifically refers to.
Q So from March of '96 to September of '98 you were out on worker's comp. And what you're claiming is the worker's comp didn't give you what you would have been making if you were at work?
A Correct.
Q And as a result of that worker's comp action, you say that you settled with the Town; correct?
A As a result of that worker's comp action from that period of time?
Q Yes.
A We agreed for me to have the periodic payments until there was some suitable employment.
Q And so that the worker's comp action ended with that







agreement, you would get periodic payments until you were suitably employed?
A I believe in terms of that particular incident; meaning, the physical injury, that was, the resolution was to be paid until suitable employment was offered by the Town.
Q And that's contained in a court record?
A Should be.
Q And then I take it in September of '98 there was suitable employment and then you went to work?
A Right. The Town, I believe the Town had contacted us at that time, and I went back to work because of the Town's offer.
Q You went back to work at the same job?
A Right, crime prevention officer.
Q If you look at Paragraph 47, you indicate, let me read it, "that although the Plaintiff returned to work in 1998 he was again taken out by a Doctor from March of '99 to March of 2001 because of the same continued treatment by the Defendant town and named Defendants as well as the police department." You say that due to these -- I'm jumping to Paragraph 48, "due to these deliberate violations, the Plaintiff suffered lost wages as will be further outlined."
What lost wages did you have as a result from being







taken out by a doctor March of '99 to March of 2001 which is a two year period?
A The lost wages would be my salary.
Q And did you file a worker's comp action for this absence, March of '99 to March of 2001?
A Yes, this was, I believe, this is my understanding, was a continued element of the first one of physical injury, but this contained psychological injury.
Q Did you prevail or win on your worker's comp action regarding March '99 to March 2001?
A My understanding is that we did not prevail in the Worker's Comp Court.
Q So why do you then say that you're entitled to be paid for that two year period when you had a court proceeding and didn't prevail?
MR. CASALE: Objection. You may answer.
A Because that was a standard for that court, and it doesn't mean that I wasn't injured by the Town and the Town was responsible.
Q You didn't get paid in your job from March '99 to March 2001, but you didn't go to your job, you didn't work for that two year period; correct?
A No, I did not work.
Q You sought through the Worker's Comp Court to get paid,

and the Worker's Comp denied that claim; correct?
A Correct.
Q But nevertheless, you feel the Town still should reimburse you for the two years that you didn't work because of the things that you claim in this suit; correct?
A Yes.
Q In Paragraph 57 which is on Page 8, I'm just going to read it again, feel free to read any other paragraphs you want to get the right context. You say, "that the damp, moldy, musty and dusty work place is exacerbating the Plaintiff's medical condition that is known to the Defendant Town."
My question based upon that allegation is what is your medical condition that is known to the Town?
A My medical condition that's known to the Town is that of severe allergies.
Q When what type of allergies?
A I'm allergic to about 21 different things, some of which my doctor can tell you better than I can. But it's basics, it would be mold, dust, dust mites, dampness, weather changes, etc. It's sort of like-- you get the symptoms are allergy induced asthma.
Q When were you first diagnosed with this allergy?







A When I was eleven.
Q Who first diagnosed it, your family physician?
A Actually, yes, Dr. Fishbein use to be up here, quite some time ago, it just comes to mind.
Q What causes the allergy is a variety of things, 21 different things?
A Yeah, and that's basically from a test that's given that shows what you're allergic to.
Q Some of the things that trigger the allergy are mold?
A Yes.
Q Musty conditions?
A Yes.
Q Damp conditions?
A Yes.
Q Anything else, like ragweed or anything like that?
A Ragweed, absolutely, trees, grass, those are some of them. There are numerous.
Q Are you being treated for it currently?
A Yes.
Q Who is your treating physician?
A Dr. Joanne MacMillian.
Q M-A-C-M-I?
A Mac, M-I-L-L-I-A-N.
Q Where is she located?







A She has an office, main office in Warwick on Toll Gate Road.
Q Is she an allergic physician?
A Yeah, she's a specialist, an ENT.
Q ENT is Ear, nose and throat?
A Ear, nose and throat. I think the name of her place is Kent ENT.
Q What are the symptoms of this allergy? Runny nose? Give me the symptoms when you come in contact with one of these causes?
A A variety of symptoms, runny nose, nosebleeds, congestion, watery eyes, headaches, sore throat. If it gets worsened, it gets into infection, chest, can't breath, respiratory problems, rashes, earaches.
Q Do you take any medication for it?
A Yeah, there's been changes in medication over the years. From the time that I was operated on to the present, there's been several changes. Right now I'm on Allegra.
Q Allegra is taken on a daily basis or when you have an attack?
A It has to be on a daily basis for me.
Q Is that a prescription drug or over-the-counter?
A Prescription.
Q Do you take it every day?







A Every day twice a day.
Q What are the, I forget the word, but what does that --
MR. CASALE: Side effects?
Q Yes. What are the side effects?
A There can be drowsiness and dry mouth, those kind of things.
Q Are those side effects to you, are you drowsy or can you carry on?
A Not really. It can happen. It actually depends on how stressed or fatigued one is but.
Q It doesn't affect though your ability to work, if you're on Allegra you can still work?
A Yes.
Q When is the last time you saw any doctor including Joan MacMillian for this condition?
A Three or four weeks ago.
Q Do you have regular appointments with her?
A I do, but sometimes-- It's suppose to be weekly, but lately -- I mean I've been doing this since 1994 -- I will go on a lesser frequency due to my schedule.
Q How has this condition affected your daily life?
MR. DeSISTO: Let me ask it another way:
Q When you take Allegra, does it affect, when you're on that medication is your daily life affected by this

condition?
MR. CASALE: Objection. You can answer.
A My daily life -- I really don't understand the question.
Q That's okay. When you take Allegra, and you take it everyday, are there some aspects of your daily routine that are affected by your condition and the medication you're taking because of your condition?
MR. CASALE: Objection. You can answer.
A It makes me feel better. It helps my symptoms. I hope that's.
Q Well, that's a start.
A I'm trying to understand.
Q Let me ask you some specifics. You already indicated that when you take Allegra you are not prevented from working, you can work if you're on the medication; correct?
A Correct.
Q And I take it you could work, when I say work, you could work at your current job, you could work at your current job even if you weren't taking Allegra, it's just that you would have these symptoms that would be very, very annoying and painful to you; for instance, your nose would run and such and such; correct?
MR. CASALE: Objection. You may answer.







A Well, I really don't know if I could work at my job without it, because I've never worked at my job without it. It would be an assumption or presumption. I don't know would be the answer.
Q Okay. When you're taking the medication, and you take it everyday -- you live alone?
A Yes.
Q Do you do the chores around the house or do you have someone that does that for you?
A I do most of the chores, yeah.
Q That means you shop for food?
A Yes.
Q Clothing?
A Yes.
Q Do the housework?
A Yes.
Q Housework, at least for me, this is what I do even though I have my wife, I vacuum. Do you vacuum?
A I don't vacuum. I use one of those new brooms, because the vacuum would bother me so, the dust. So I use one of those roller brooms.
Q Does it work?
A Actually it does. I don't have much rug because of the allergy. I try to do as much without rug and those kind







of things.
Q You certainly can perform manual tasks, lifting, you're not affected by that?
A No.
Q And the condition and the medication doesn't affect your ability to walk obviously, right?
A No.
Q To see? You can see fine, can't you?
A Yes.
Q To hear?
A Yes.
Q Do you regularly workout?
A I try as much as I can, yes.
Q How do you do that?
A I have weights at home, free weights, and I belong to a gym.
Q And do you go to the gym regularly?
A I try. I try to go once or twice now a week.
Q What do you do at the gym?
A I do a total fitness workout. I run which is good for, it opens up my passages, actually it was recommended to me by one of my doctors. And I use various weight machines for body parts. And one of the biggest things about the gym and why I really go is to use the steam







room. The steam room absolutely is one of, a recommended thing to do when you have this kind of condition.
Q Have you been given an expected duration for this condition? Are you going to have it all your life or has that been discussed with your physician?
A Actually several physicians said I will have it all my life.
Q Are there any long term impacts to the condition other than you're probably just going to have to take Allegra?
A I think that would be on a day-by-day basis to see what happens.
Q What I mean is has a physician said to you, for instance, because of your allergy condition, gee, in about five years your lung is going to collapse; you haven't been told that?
A Oh, no, I've never been told anything like that.
Q How does your allergy when you're taking Allegra interfere with your job or the performance of your job?
MR. CASALE: Objection. You may answer.
A My taking of the medication doesn't interfere with performance of my job.
Q So that, I don't want to go roundabout this but in Paragraph 57 you indicate, look, I was in a damp, moldy musty and dusty work place, and it exacerbates my medical

condition.
We determined that your medical condition is an allergy and that you take Allegra for it. When you're working in, it doesn't have to be in this office, but generally if you're working in a musty, damp, dusty place but you're on Allegra, how are you affected?
A The mold, the elements still affect me. I become susceptible to the various symptoms, such as rashes congestion. If you notice, even right now I'm congested because of the ragweed that's outside. Similarly if I were in a mold, damp, dusty, musty room for seven hours, that would affect me as well and I'm on Allegra now.
Q So that the more that these conditions exist, the worse your symptoms get even if you're on Allegra?
A Correct.
Q Are you still working in the damp, moldy, dusty work place that is specified in Paragraph 57?
A I just want to verify which place that is. 2002 would be Division of Inspections for 2002, and the answer would be, no, I'm not in that area now.
Q When did you move from that area?
A April, April of this year.
Q Where did you move to?
A From the Division of Inspections which is another







building back to the police department.
Q Where in the police department are you working?
A Right now I'm in, it's -- well, it's probably the top floor if you will, because there is a basement and a top floor. And I'm on the top floor in the middle, next to the prosecution unit.
Q Is that work place damp, moldy, musty or dusty?
A Moldy, I believe it's moldy. It's somewhat dusty. That's what you asked, right?
Q Is there a better place in the police department that would -- Is there a better place for your condition within that building?
A Well, where there's air conditioning is better. The unit in the police department has broken down, the huge unit that operates, so that's become a problem. But they do have other offices that have air conditioners in the windows, those are occupied by lieutenants and captains to my understanding.
Q Would you expect to be in one of those offices?
A That would be a management decision, and that's, you know, right now they're being occupied by administrative staff and dispatchers.
Q Have you asked to be put into one of those offices?
A Basic request was to be put into a place that is well







ventilated, not.
Q Have you advised anyone in the Town that where you're working now is not well ventilated?
A I've advised many people in the Town that this is not a well ventilated area, especially since the breakdown of the general system.
Q Have you advised someone in writing or was this orally?
A Orally.
Q Who have you advised?
A Basically spoke with Lieutenant up in there who is now my supervisor, Lieutenant Bradley.
Q Anyone other than Lieutenant Bradley?
A I speak to the officers that are in charge, like the chief, but it's a general knowledge that I'd like to be in a place that you can breath. I mean I think everyone in there would.
Q Bear with me because I want to focus on a broad range of jobs rather than your specific job right now.
Your medical condition at this point, the allergy, taking Allegra, doesn't prevent you from working at any other jobs?
MR. CASALE: Objection. You may answer.
A It wouldn't prevent me from working at any other jobs. It would effect me if that job contained a place that was







mold, damp.
Q Right. So that if you were working in a factory that wasn't moldy or damp and well ventilated, I'm not saying you would, you're obviously very qualified, but if you were working at a factory that was otherwise fine, you could work there?
MR. CASALE: Objection. You may answer.
A Again, I could presume that I could work there. I've never done that but I could.
Q If you decided to practice law and went to Massachusetts and were working in an office that was well ventilated and not dusty or moldy, that would be fine; correct?
MR. CASALE: Objection. You may answer.
A That would be fine.
Q Same question on retail sales, I'm not suggesting you would work there, but if you wanted to sell clothes in a clothing store and it was otherwise well ventilated and not dusty or musty, you would be able to work there even with your condition; correct?
MR. CASALE: Objection. You may answer.
A I would presume that I could.
Q You may have sensed that I'm doing this for a reason so bear with me. You have the ability to brush your teeth; correct?

A Yes.
Q Wash your face?
A Yes.
Q You have the ability to bathe yourself, that's quite obvious; correct?
A Yes.
Q Do you have a garden?
A No.
Q If you had one, you could garden, couldn't you?
A I could, but I'd probably sneeze.
Q And in the morning you fix breakfast for yourself?
A Yes.
Q Do you do your own cooking or?
A Half and half.
Q Who does the other half?
A I visit my parents.
Q You do your own laundry?
A Half and half.
Q That's all right. I'm going to move on to a third topic, this concerns your job function.
What is the name of your job, title of your job?
A Crime prevention officer.
Q And is there a written criteria for your position?
A Yes.





Q Who wrote it?
A My understanding is that it was a collaboration between the Town and the Union to come up with a job description.
Q What are your duties as you know them to be?
A The duties that I know them to be from the written document are explained right on the document. Is that what you mean?
Q Yes. I don't have the document in front of me, but I know I'll get it or have it.
Just generally what are your duties, not holding you to that, we'll rely on the document, but what are your duties?
A Basically the summary of them are to be a liaison to the police department with public and private agencies and work closely with all members of the department and be a public relations type of an officer. You develop crime watch programs. You work for safety, public safety and personal safety. You create awareness. Again, it's all a liaison position. You're concerned with security. You're concerned with emergency contact numbers for different agencies, that kind of thing. Alarms, you want to make sure alarms are working properly, proper security devices around. Technically you're suppose to be training people in the department too about those





security devices. And you monitor crime trends and create programs to try to thwart those, crime prevention. Neighborhood programs are a big part of it. Those would be something like a crime watch, different identification programs, etc. To try to prevent crime. And you're also suppose to from time to time write things for the media or speak to the media about different matters.
Q Is your position a union position?
A Yes.
Q What union are you a member of?
A Local 1033.
Q Does that union have a Collective Bargaining Agreement with the Town of North Providence?
A Yes.
Q You're subject to that?
A Yes.
Q Does your job allow you to make arrests?
A The job has had the ability to have the person in the job have arrest powers.
Q I don't know what that means.
A I don't either, that's what has been by practice and conduct, even by my own observation of the crime prevention officer prior to me, there were powers of arrest and all the other accoutrements that go along with





the police work.
Q Was the crime prevention officer before you a member of the North Providence Police Force?
A As I am, yes.
Q Well, not as you are. Was he on officer before he became the crime prevention officer?
A My understanding was he was crime prevention officer and special police officer at the same time.
Q You know from going to law school that your authority and ability to arrest is pursuant to state law; correct?
MR. CASALE: Objection. You may answer.
A Well, I think in context of that statement, I mean there is also a citizen's arrest. I don't know where you.
Q What gives you your sense or perception that the crime prevention officer can make arrests?
MR. CASALE: Objection. Go ahead and answer.
A Based on the practice that was involved with the Town, and my understanding was that he was commissioned to do that.
Q Is your written job duty or are your written job duty responsibilities, do they indicate that you have the power of arrest?
A The written -- My understanding of the job description may require that based on investigating cases and doing

reports, those kind of things in follow up to the police chief. It can be inferred through the job description, that's my understanding of the job description.
Q Have you discussed this with the chief of police and said I think I have the ability to make arrests?
A Which chief of police?
Q Any of them?
A I've written to, I've written to them and met with them and expressed my understanding about the arrest powers of the CPO.
Q Have any North Providence Police chiefs or any officers indicated that they believe you do have the power to make arrests?
A Basically each one felt that it's an arbitration matter.
Q So that when you said to them I should have the power to arrest, they said you better arbitrate that, we're not going to agree to that?
A Well, they said that it's an arbitration, you already have a grievance, and particularly the state police when they came in, he didn't want to make a decision. And again, the other police chiefs would merely in a roundabout way say you have your grievance in. No one ever said you can't have arrest powers or you don't have arrest powers, it's it has to be decided.







Q Has it been decided?
A As of today, the arbitrations are still in abeyance because it's in Superior Court at this point.
Q So you grieved your ability to make arrests, you filed a grievance on that?
A I filed a grievance on the entire job description not being given to me.
Q In that grievance was the issue of whether or not you could make arrests brought into, was that discussed in the arbitration?
A I think generally that would be part of it, particularly since they made it a requirement at one point to go to the police academy, it was part of the arbitration. So when one goes to the police academy, if that's what they thought they were going to do, one would tend logically to make arrests.
Q Did the arbitration decision that was appealed indicate that you had the power of arrest?
A I don't recall it saying I had the power of arrests.
Q Have you ever made an arrest?
A No.
Q Do you carry a gun?
A No.
Q Have you ever stopped anyone for a traffic violation?







A No.
Q I'm going to take a specific date, it's November 6, 2001, after that date do you feel or do you state that you were harassed in your job?
A Yes.
Q And what are the specific acts of harassment that you have encountered?
A Basically from 2001 there was a general lack of recognition for the CPO position. I was placed in a records office with clerks. And basically the understanding was among individuals in there that I was a clerk and that was my position and I was given clerical work. Also, you know, people would not call me by the title of CPO, not recognize a CPO when members of the public would come through. Let's see.
You're talking about after 2001, right?
Q Right, after November 6, 2001.
A Okay, after November 6, 2001, then certain things were given to me to do and then taken away. Then I filed another grievance. And the atmosphere around that grievance was also hostile.
Q In what way?
A By the police administration, you know. When I filed the grievance I was told by my commander, you know, that I







was to, you know, sit and do the work at my desk, and I had to punch out for breaks for 15 minutes if I had to do that, and what are you doing now, very rigid type of treatment once I filed the grievance.
Q Anything else?
A Basically after that when I would express my rights to the job description, the administration would react by taking administrative action against me, and I believe that's a form of harassment; twice in fact.
Q Anything else?
A I think being moved to the Division of Inspections and then having to come back and punch in at the police station for assignments and then getting no assignments was harassment. I think that getting a half hour unilaterally taken away of my lunch hour was harassment. Let's see, I think knowing of my medical condition and placing me in places that would possible exacerbate that medical condition was harassment.
Q Anything else?
A That's all I can think of right now.
Q And you understand that under the terms of your Collective Bargaining Agreement, if you have disagreements with the way you're treated, you can file a grievance, and in fact you did file a grievance; correct?

A Yes.
Q Are any of the things that you mentioned here, taking half an hour of lunch away, not calling you by your title, told to punch in, are any of those things not grievable?
A Those are all grievable and I believe I did grieve them.
Q Were there any acts of harassment that you felt you could not grieve through your Collective Bargaining Agreement?
A I think a lot of the statements that were made along the way from 1994 all the way up to the present, particularly when I was in the basement, would not be grievable. I don't know if that's a contract violation. I believe that consistent harassment would fall under another standard.
Q After November 6, 2001, what statements were made to you that you considered harassments, and who made them?
A After 2001?
Q After November 6, 2001 what statements were made to you that you felt were harassment, and who made them?
A Well, many of the statements were, and I know your question is after 2001, but most of the statements came from 1994 to 2001. There might have been certain things like, you know, I've worked here a short period of time and I've done more than you do, that kind of thing, just







general comments like that consistently.
Q Are you able to say who made those statements?
A They were all different patrolman. I can't specifically say who.
Q And after November 6, 2001 did those statements continue?
A Yeah, somewhat of a daily busting up I would call it. I also-- There were other instances where people would, again, not recognize the job and make certain comments about, like the jacket that they give me, about can you wear that insignia, it says police department on it. Those kind of things.
Q Other than statements being made were there any other acts of harassments that you felt you could not grieve through the Collective Bargaining Contract?
A Like I said, those things. The actual move itself, I don't know if that was grievable, the move to the Division of Inspections. That was a unilateral change. It could be noted as grievable, again it's up to interpretation. But a lot of these things, like I say, started from 1994 all the way up through those actions which were the suspensions, that just were consistent. It was consistent harassment up to the time of April.
Q But my question is: Can you identify anything other than statements that you consider to be harassments that you







could not grieve through the Collective Bargaining Contract?
A I think there was-- I remember being told that I was using police department stationary for personal reasons. And I felt that might have been defaming which wouldn't be grieveable.
Q Anything other than statements and being told you couldn't use stationary for personal reasons that you felt were acts of harassments that could not be grieved through the Collective Bargaining Contract?
A No, the grievances I put in were done to try to resolve those issues.
Q Now, you made reference to being subjected to administrative suspension. I think you mentioned that in your Complaint, Paragraph 62, it's on Page 8, that refers to a ten day suspension.
What was that suspension? What did that suspension concern?
A That was basically about a vehicle, wanting to use a vehicle from the police department to go to a business activity, and it also incorporated that stationary business we just spoke about, and also it had to do with an accusation of a pattern of tardiness. Those were the three issues I believe, but I'd have to review.







Q So your general memory is you had three issues and because of that you were administratively suspended without pay for ten days?
A That's my recollection.
Q Now it says that as a result of the suspension, you filed another grievance, that's in Paragraph 63?
A Yes.
Q And that on December 9, 2003 the suspension was vacated; correct?
A Correct.
Q Now, does that mean that the issue concerning the stationary was grieved and you had a successful result?
A There was a result, and it was a stipulated agreement that was agreed to by the parties. The case never went forward on merits.
Q Well, was the suspension vacated?
A It was vacated.
Q And was it vacated as a result of an arbitration award or decision?
A It was turned into an agreed upon stipulated award that had certain items in it that were agreed to, and that's why I say the suspension was vacated because these other items took its place.
Q So you agreed with the Town to resolve the matter;

correct? You both agreed?
A It was a stipulated award for those particular items, we agreed to those items.
Q As a result, that took care of the grievance, that resolved the grievance because you agreed with the Town; correct?
A It took care of that part in terms of suspension.
Q Was there another part of the grievance that went on, or did the grievance end because you had agreed with the Town?
A There was no remaining issue but for the fact that I wasn't paid. That was the end -- okay, I wasn't.
Q Well, when you formed your agreement with the Town, did you leave open the issue of whether you would be paid? Why wasn't that decided in the agreement?
A I believe that was addressed in one of the items, I'd have to look at it.
Q If it was addressed in one of the items, why do you make complaint that says that you still lost ten days pay?
A Because the genesis of this whole thing was that in my understanding the Town initiated this situation whereby I lost this particular amount of pay, this wasn't a volunteered ten day situation.
Q Let me see if I have this correct though: You get







suspended, you lose ten days of pay, you grieve that, you end up stipulating to a resolvement of the grievance.
Didn't the resolvement cover whether or not you'd be paid?
A It may have. I'd have to look at the particular point in there. It may have in terms of that, but my.
Q If it did, then why do you say you still lost ten days pay if you agreed?
A I guess, again, we're getting into standards here. My agreement with the grievance was at one level. My agreement to the Town's action of suspension as a matter of harassment at another level.
Q I just want to be clear: What you feel is if you grieved it and agreed with the Town on the grievance, you're still able nevertheless to sue them for harassment on the same conduct?
A That's my understanding.
Q Okay. And it says, Paragraph 66 says, "that, on or about March 25, 2004 the Defendant Town and/or Defendant Spaziano gave Plaintiff in violation of Plaintiff's Rights an Administrative Suspension Action to the Plaintiff, for 30 days without pay." What is that all about?
A That's another time where one of the non police







supervisors was stopping me from doing what is traditionally a CPO job description item, and I expressed my rights, and I was suspended.
Q So for merely expressing your rights you were suspended for 30 days?
A That's my understanding.
Q Your understanding comes from what, you were there, right?
A I was suspended, right.
Q How did you, what was the manner in which you conveyed your rights that caused the suspension? Was it in writing?
A No, I didn't put it in writing this time because I was -- the chilling effect of putting things in writing to the Town, especially if everything is being called personal on Town stationary, so I verbally expressed my rights.
Q Who did you express them to?
A I expressed them to the person that was -- First I obeyed. Then I expressed my rights verbally to the person that stopped me from performing the item in the job description. Then I expressed my rights to the union. Then I expressed my rights to the commanding officer.
Q What was the thing that you were doing within your job







description that they stopped you from doing?
A Relating as a liaison to the citizenry in a public safety matter; this particular thing was awareness of a woman being stalked, which is like the classic example of what a crime prevention officer would do. Then the next step would be to speak to the person, then make some observations if possible, and contact the appropriate unit.
Q Who was the person who came to you that was being stalked?
A Well, the specific person was someone, a member of the public that came into the building.
Q What was that person's name?
A I don't -- I never got to help her because I was stopped.
Q So she came into the building, was she directed to you?
A I was called down to the front by another worker.
Q And you started to what, interview this person?
A No. By the time I got halfway down the corridor, this person, the non-police super -- technically he's a supervisor, a director of planning, waved me back and stopped me and said this doesn't concern you, I'll take care of it, go back there, and I did.
Q And then what did you do as a result? Did you yell at someone? Did you question someone?

SHEET 12 PAGE 42

42

A No. I went back at that point.
Q All right. And then what happened?
A After that there was a second part to this.
Q Go ahead.
A I did come down to make a copy in the front, and there was another worker talking to this particular director of planning about the situation. And when he and the director and were making the conversation, I was making the copy. The other worker looked to me and said that sounds like a job for the CPO, and I said it was a job for the CPO. And then the director turned around to me and said in a loud voice, it's not a job for the CPO and -- you know, it's just not a job for a CPO. Those kind of things. Those are the things I remember.
Q What happened though? Why did this result in your suspension? What did they say you did wrong to be suspended for 30 days?
A Oh, there were about three or four things written down on a document from the police chief suspending me. One was confronting a supervisor. There were several things. I'd have to read it. I don't really recall.
Q Well, I mean it's not usual that you would get suspended from your job for 30 days. You don't remember other than them saying that you confronted someone?



PAGE 43

43

A That was the crux of it. I confronted him, and then there were other things that I thought were not logical to be there; like disrupting the office when there was no one in the office to disrupt; conduct unbecoming when all I did was speak the same level he did when he confronted me, I didn't even approach him.
Q Who is this person that they allege you confronted?
A Leo J. Perrotta.
Q When you were suspended, you were suspended without pay?
A Yes, for 30 days.
Q Was that in writing; in other words, given a written suspension?
A Yes.
Q And did you grieve that?
A Yes.
Q What happened as a result of the grievance?
A Once again, it got into a stipulated agreement at this time.
Q So that it never went to an arbitration hearing?
A It went to the arbitration hearing, but the hearing never went along on its merits and.
Q When you stipulated to the agreement, what did you stipulate to?
A The basics of this one was, first, I guess this



PAGE 44

44

particular matter would be held in abeyance for a certain amount of time; then, if in fact there were no more alleged incidents, then this would completely be rescinded in a particular amount of time. And if there were other incidents, then I would have the right to try this matter for its merits, and that particular incident, whatever it was. That's.
Q What has happened since? Has the time period gone by?
A No, we're still in it. I think it was a year, year from the time of the hearing which was I believe, I'm not really sure what the date was, I'd have to check it.
Q And when that time goes by, you get your 30 days back?
A My understanding is it would be rescinded, that's.
Q Do you know what that means?
A No.
Q But nevertheless you agreed to it?
A In my mind it's I get rescinded and I get the money back.
Q Did you want to make sure of that before you signed whatever you signed?
A I didn't sign anything. The union and the administration signed it.
Q Did the union talk with you before they entered into this agreement?
A Yeah, and it would be rescinded.



PAGE 45

45

Q Who is the union person that you talked to about it?
A Ronald Coia.
Q Did you say to Mr. Coia, by the way, before I agree, I want to know that I'm getting my 30 days pay back or did you just leave that open?
A In my mind I presumed it then. I didn't really question it. If something's rescinded, it's rescinded, and you get made whole.
Q When you grieve something, does a union rep represent you in the grievance?
A Yes.
Q Who has represented you in some of the grievances that we've outlined today?
A Ronald Coia.
Q Are you satisfied with the union's representation of you?
A At this point I am.
Q Do you feel that they could have grieved more issues than they did?
A I think they've taken it to the ultimate place they could. They even tried to negotiate a job description that didn't work out.
Q And what is the last act of harassment that you can remember that has happened to you?
A Not giving me any duties at all when I came back from the

Q Did you complain about the conditions in the basement relative to the damp, dusty, moldy area?
A Yes.
Q What did the Town tell you?
A No comment back, nothing. It was just ignored.
Q Did anybody else have a desk down there?
A There was a lieutenant, but he wasn't in the same area I was. He was in another area that was closer to some doorway that got some air in it.
Q Was that lieutenant stationed at that desk or was he out on the road?
A In and out.
Q He had the ability to leave?
A Yes.
Q Did you have the ability to leave?
A No.
Q That occurred from '95 to '96; correct?
A Right, summer of '95, either it was July or August '95 to when I went out.
Q Now you got better and went back to work; correct?
A Correct.
Q And you reported back to work I think your testimony was in '98; is that correct?
A '98.







Q Where did the police department put you when you came back to work?
A When I came back to work it was in a records office with the clerks.
Q Can you describe to me the conditions in that office?
A It's the same building only in the back of the building, and it's on that first floor that they have me in now that they placed me in April, but it was a different section. So it was in the back of the building with that same ventilation system and the same atmosphere of the building.
Q Were you able to walk out of the building to get some fresh air?
A No, you weren't-- my -- again, strictly monitored, I had to stay at my desk and do what I had to do and that's it.
Q What did you have to do?
A The most I was given at that point was data entry and limited crime analysis on the computer when I could find a computer to use.
Q But would they let you go outside into the community?
A No.
Q Now, there came a point -- how long a period of time were you in that records office?
A You mean length, the whole period of time?







Q Right.
A Came back in '98 and left again in '99, either March or April of '99.
Q And then you came back to work, correct?
A Again in 2001.
Q Where did they put you in 2001?
A Okay, now at that time the records office again, but physically the records office moved to the middle of the building. So now I'm in the records office in the middle of the building instead of at the end of the building.
Q Did they move you from that records office?
A They moved me from the records office in 2002 to the Division of Inspections.

MR. CASALE: We'll mark this. I'm going to need the original back. It's not going to copy very well, but I can get you a photostatic.

MR. DeSISTO: Do you want me to make a copy now, and we'll mark the copy the exhibit?

MR. CASALE: Yes.

(copy made)

MR. DeSISTO: We'll make the copy of this the exhibit subject to your providing this original.

(Whereupon; one-page containing two xeroxed photographs marked Plaintiff's Exhibit 1 for Identification.)







Q Do you recognize this photo?
A Yes.
Q When was this photo taken?
A This photo was taken approximately December 2003.
Q And does that photograph accurately resemble -- Did you take the photograph?
A Yeah, absolutely.
Q That's your writing on it; correct?
A Yes.
Q Does that photo accurately and fairly resemble your working conditions in December 2003?
A Yes.
Q And what is that on the floor there in the photo?
A The top photo, that is a container to hold the water leaking from the roof into it, and those big dark marks around it are the rug under it saturated.
Q When the police department moved you to this sunny location, did they express a reason why?
A The police department?
Q Yes.
A The police department moved me there so I would help them-- this was the understanding -- write grants and clean up the mess that the grant situation was in in that Division of Inspections.

Q So the police department moved you to the Division of Inspections to help write grants?
A That's what was said officially.
Q Was there an unofficial reason that you know of?
A Well, everything -- the duties had been taken away from me at the police department. It was at a stagnant level. I was sitting in the middle of the building now in 90 degree temperatures, things weren't working out. I had put a grievance in about the job, and we were at that point in 2002. So there was an agreement made that I would be put over to the Division of Inspections until a suitable job description was negotiated or arbitrations were done or some kind of ruling, and write grants temporarily but still be part of the police department with the supervisor as Captain Richardson at the time.
Q Did you report to work every day at that location?
A Yes, I did. I went to this location. Then as I testified, it was changed. It had been changed to punching in at the police department, supposedly getting assignments, and then going back to this building.
Q So you punched in at the police department. Did you receive any assignments?
A Never.
Q And then you would be expected to go to that building;







correct?
A Correct. I have to correct myself on that, there was one grant seminar that the planner couldn't go on that they did send me on, and that was an issue about a vehicle as well.
Q Other than that were you able to leave the, were you able to leave the inspection department during the course of your day?
A No, no.
Q So you were required to perform all your functions in that environment; correct?
A Correct.
Q Did you mentioned to the Town that you had these sinus and allergy conditions?
A Yes.
Q What was the response?
A Well, I said it many times. I said it to the people in the Division of Inspections. All they did was commiserate because they had allergies as well and that kind of thing, and that's just the condition of the building and that's the way it is. I several times informed the Mayor's office even at the administrative suspension time, that was the time I wrote a response, and verbally in their presence.







Q Other than allergies and respiratory problems that you said that you developed, do you recall developing any skin rashes?
A Oh, in this building I developed skin rashes several times, that I vividly recall. In fact, I was reminded of if by the secretary about how red my neck and my face would get.
Q What would you do to deal with those skin allergies?
A At lunch time I would go home and try to refresh myself with the things my doctor would tell me to use.
Q Did you ask the Town for, and when I say "the Town", I mean the Town or any of its Defendants or any supervisory personnel for either some compensatory time to deal with your medical condition?
A We did ask for that. In fact, I started asking for that when they started asking me for comp time when I would come in later in the morning from what I think was being in these environments for so long and then trying to revive myself at night to get back in in the morning and attacks in the morning when that happened.
Q Were there times when you came in five to ten minutes late?
A There were, yeah, there were times when that happened.
Q What would the Town do?







A They would make me put in a comp time slip for being not on time.
Q What do you mean by comp time?
A You'd have to put in a slip that shows you had a certain amounts of hours that were allocated to you and that time was taken away.
Q How were you sleeping during, and when I talk about, I mean this is an entire time period of 13 years that this has been going on, but I'm really concentrating on when you were put in this area in December or actually you said December of 2003?
A Yes, this was around that time.
Q How were you sleeping during that time period?
A When I would -- I wasn't sleeping very well and not very long, because it would take me the better part of the night to try to recuperate from the symptoms I had, like you mentioned the rash, etc. congestion. And I would revive myself and maybe until around 1 in the morning, 2:00, I would start feeling better. And when I felt a little better, I would go to sleep. So I'd sleep from maybe 2 to 6, because it would take me from 6 to whatever time to try to get ready to come in from the symptoms.
Q Now the rash that you testified to, I think you said was on your neck. Was it anywhere else?

SHEET 19 PAGE 70



assigned to the case; correct?
A Yes.
Q Judge Silverstein heard argument back in 1999; correct?
A Yes.
Q And to this date has not written a decision; correct?
A Correct.
Q Now you've come to find out over the past couple of months from your attorney what happened with that decision from Judge Silverstein; correct?
A Yes, I have.
Q And could you tell my Brother what your understanding of that is?
A My understanding is based on my attorney's information to me was that they did not have the case and they had lost the file and they were now retrieving the file from wherever it was.
Q To fill in the gaps: It's your understanding that through some clerical error in the clerk's office a file got archived; correct?
A Yes, that's my understanding.
Q So no decision has come down as to this arbitration from the Superior Court?
A To date no decision that I'm aware of.
Q Now, let's talk about what's happening to you today.



PAGE 71



Since this lawsuit has been filed they have moved you from the Department of Inspections; correct?
A Yes.
Q There was an agreement to put you as a temporary planning official; correct?
A Correct.
Q And now you're back as a CPO; correct?
A Yes, I was a CPO then too.
Q Right, but you weren't performing those duties, you were performing town planning duties; correct?
A Correct.
Q And you're back in the police department; correct?
A Correct.
Q You're in a better facility than you were in the Department of Inspections and Standards; correct?
A Correct.
Q They're actually giving you some assignments to do as a CPO?
A They are at this date, yes.
Q Basically the harassment has stopped; correct?
A Basically, the great animosity and harassment has stopped.
Q Other than one individual in the police department; correct?



PAGE 72



A Yes.
Q When you were suffering from these conditions that put you out on worker's comp in 1996, do you remember that time period?
A Right, right, basement.
Q And your testimony was that the conditions were severe enough that you went out on worker's compensation; correct?
A They were severe enough to be on worker's compensation; correct.
Q Were you able to perform, while you were suffering from these conditions, were you able to go to work?
A I was able to get to work.
Q Were you able to perform your job duties?
A I had great difficulty performing my job duties and concentrating.
Q After you left work for the day were you able to perform your normal life activities?
A Not during the week after work.
Q Why was that?
A Because of taking care of the symptoms from being subjected to the elements of the work place.
Q Was it more, were the symptoms more than runny eyes and runny nose?



PAGE 73



A Yeah, yes.
Q Describe some of the symptoms?
A It was a combination of all the symptoms that you get when you get a severe reaction or sinusitis; including, the rashes, including fatigue, weakness, in fact, there were times I would get up from the bed and faint. So I could not workout at the gym. I could not do my regular activities after being in that basement at night.

MR. CASALE: That's it.

REDIRECT EXAMINATION BY MR. DeSISTO:

Q I have to follow up. First of all, you mentioned someone who is still harassing you and has animosity to you in the station. Who is that person?
A I believe in terms of that it would be for assignments when we talk about animosity, and it appears that, and this is my understanding, that the Major there now does not want to give me assignments.
Q Who is the Major?
A Major Santora.
Q That's the form of harassment and animosity, he doesn't give you assignments?
A Right, he doesn't give me assignments, and his personality has comments that are of his personality so I'm not sure whether they're, you know, it's harassment