UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DAVID P. ESPOSITO, Plaintiff, | : | |
| v. | : | CA 04-302 S |
| TOWN OF NORTH PROVIDENCE, by and through its Finance Director, ROBERT DISTEFANO, and its agents, MAYOR A. RALPH MOLLIS, JOHN FLEMING, ERNEST C. SPAZIANO, G. RICHARD FOSSA, WILLIAM V. DEVINE, JOSEPH DICENZO, LEO J. PERROTTA, and WILLIAM ABBATEMATEO, Defendants. | : | |

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the Court is Defendants' Motion for Summary Judgment (Document ("Doc.") #19) ("Motion for Summary Judgment" or "Motion"). The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). A hearing was conducted on January 19, 2006. After reviewing the filings, listening to oral argument, and performing independent research, I recommend that the Motion be granted.

**Facts**[1]

Plaintiff David P. Esposito ("Plaintiff") is the Crime Prevention Officer ("CPO") for the Town of North Providence, Rhode Island (the "Town"), and a member of Public Service

---

[1] The facts are based on Defendants' Rule 12.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment (Document ("Doc.") #20) ("DSUF"), the Verified Amended Complaint (Doc. #3) ("VAC"), and Plaintiff's Deposition ("Dep."). For purposes of deciding the instant Motion, the allegations contained in the VAC and Plaintiff's deposition testimony are assumed to be true.

Employees' Local Union 1033 ("Local 1033"). Defendants' Rule 12.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment (Doc. #20) ("DSUF") ¶¶ 1-2. In 1990, the CPO position was the subject of a dispute between Local 1033 and the police officers' union with both unions claiming the right to name one of their members to the CPO position. Id. ¶ 3. Part of the dispute concerned the job description and job qualifications for the position. DSUF ¶ 3. It was ultimately determined through arbitration that the position should be filled by a Local 1033 member. Id.; see also Verified Amended Complaint (Doc. #3) ("VAC") ¶ 14. Plaintiff, who at that time was the Town's Community Development Director and a member of Local 1033, applied for the CPO position.[2] VAC ¶ 12. Although Plaintiff successfully completed and passed the tests for the CPO position, id. ¶ 26, Defendant John DiCenzo ("Chief DiCenzo") refused to appoint him, id. ¶ 27, and the Town attempted to abolish the position, see Plaintiff's Deposition ("Dep.") at 48. Local 1033 filed a grievance about this action and took the matter to arbitration. VAC ¶¶ 28-29. In 1993, the arbitrator directed the Town to appoint Plaintiff as the CPO. DSUF ¶ 4.

When Plaintiff started work on June 21, 1993, see VAC ¶ 31, Chief DiCenzo told him that he was "in for a rough ride," Dep. at 49. During the first ninety days, the Chief placed Plaintiff at a desk in a corner, monitored his every move, and refused to equip him consistent with prior custom and practice. VAC ¶ 32. Plaintiff was prohibited from talking with anyone for more than sixty seconds and was not allowed to leave his desk. VAC ¶ 33. He was required to use a particular corridor when going to and departing from work. Id. Chief DiCenzo and the Town allowed non-bargaining unit workers, namely police officers, to perform

---

[2] Plaintiff had been employed by the Town since at least 1987. See Dep. at 55.

Plaintiff's work and prohibited Plaintiff from performing it, with the result that Plaintiff was relegated to clerical work. VAC ¶ 34.

In July 1994, Plaintiff filed a grievance pursuant to the Collective Bargaining Agreement, complaining that the Town was denying him the right to perform his job as described in the CPO's job description. DSUF ¶ 7; see also VAC ¶ 36. A decision fully favorable to Plaintiff was rendered by an arbitrator on or about November 21, 1999. VAC ¶ 37. The Town appealed the arbitrator's decision to the Providence Superior Court, and the appeal remains pending before that Court. DSUF ¶ 7; VAC ¶ 40; see also Dep. at 69-70.

Following the filing of the grievance in July of 1994, Defendants engaged in numerous activities allegedly designed to force Plaintiff to leave the CPO position, such as placing him in an unhealthy and dangerous work area within the police department,[3] confining him to a records office for seven hours a

---

[3] Plaintiff testified that when he started work in 1993 he was placed in "an executive support room," Dep. at 52, on the first floor of the police station. After Defendant William V. Devine became chief in 1995, Plaintiff was placed in a squad room in the basement which had no windows, id. at 53, and which was damp and musty, id. at 56. Plaintiff described the room as:

> Basically airless because the air wouldn't come out of the ventilation system. There was mold in there. It was dust. It was hot, very hot. There were also -- It was close to the garage, the mechanics garage, so there would also be fumes I remember coming in from the garage, gas fumes.

Id. at 53. Plaintiff remained in this basement room from the summer of 1995 to March of 1996 when he "went out," id., on worker's compensation because of "[c]onsistent sinutitis [sic] infection problems from the room," id., and psychological problems stemming from the Town's refusal to give him any CPO duties and harassment, id. at 55. The harassment frequently took the form of police officers asking Plaintiff, "what are you doing," id. at 51, "are you running a travel agency," id., and "don't you have anything to do," id., when Plaintiff had not been given any duties, id. Additionally, the officers put their guns, religious documents, and a crucifix on Plaintiff's desk,

day (where he was required to make copies for the clerk in ninety degree heat), and not allowing Plaintiff to perform the duties of CPO.[4] VAC ¶¶ 41-42. Plaintiff alleges that Defendants deliberately exposed him to an adverse and unhealthy work environment, causing him to suffer severe physical and psychological health problems and resulting in his being unable to work from March 1996 to September 1998. Id. ¶¶ 43, 45; see also DSUF ¶ 13. Plaintiff's claim for Worker's Compensation benefits for this period was resolved by a stipulated agreement between Plaintiff and the Town, awarding Plaintiff benefits based on his physical ailments but denying his claim to the extent that it was based on psychological injuries. DSUF ¶¶ 14-16.

Plaintiff returned to work in 1998,[5] but left again in March of 1999 upon advice of a doctor because of the same abusive treatment by the Defendants and police officers. VAC ¶ 47. He remained out of work until March of 2001. Id. Although Plaintiff sought Worker's Compensation benefits for this second extended absence from work, he was unsuccessful. DSUF ¶ 16.

After an absence of two years, Plaintiff returned to work in March of 2001. VAC ¶¶ 47, 49. He was again subjected "to the same deliberate and harassing behavior by the Defendant [T]own and other named Defendants," VAC ¶ 49, and not given proper

---

and they "sabotag[ed]," id. at 55, Plaintiff's documents.

[4] Plaintiff's understanding of the role of CPO was that he would spend some time in the police station and some out on the streets. Dep. at 57. However, the Town through its police department required him to remain in the station during his entire shift. Id.

[5] When Plaintiff returned to work in September of 1998, see VAC ¶ 45, he was assigned to work in the records office on the first floor of the police station, see Dep. at 59. He was again strictly monitored and required to stay at his desk. Id. The most that he was given to do "at that point was data entry and limited crime analysis on the computer when I could find a computer to use." Id. He was not allowed to go outside into the community. Id.

duties consistent with his position as CPO, id. Plaintiff returned to the records office, although that office had moved to another part of the first floor of the police station. See Dep. at 60.

In 2002, the Town changed Plaintiff's work location from the police station to the Division of Inspections which was located in a damp and moldy historic fire station.[6] VAC ¶ 51; see also Affidavit of David Esposito (Doc. #27) ("Plaintiff's Aff."); Dep. at 62. Plaintiff was told by Defendants that this move was temporary and that if he wrote the applications for police grants and "cleaned up the mess that the [g]rant situation was in," VAC ¶ 52, he would "get the CPO job description ...," id., and the harassment would cease,[7] id. In an effort to end the harassment,

---

[6] When Plaintiff was reassigned to the Division of Inspections, he received a memorandum from the Mayor's chief of staff, Defendant John Fleming, which "chang[ed] the Plaintiff's title and department to (no title)," VAC ¶ 60, reassigned him from the Police Department to the Division of Inspections building, id., and stated that he would not receive any assignments from the Police Department and would not be provided a vehicle from the Police Department, id.

[7] Plaintiff described the circumstances surrounding his move to the Division of Inspections as follows:

> The police department moved me there so I would help them-- this was the understanding -- write grants and clean up the mess that the grant situation was in in that Division of Inspections.
>
> ....
>
> [T]he duties had been taken away from me at the police department. It was at a stagnant level. I was sitting in the middle of the building now in 90 degree temperatures, things weren't working out. I had put a grievance in about the job, and we were at that point in 2002. So there was an agreement made that I would be put over to the Division of Inspections until a suitable job description was negotiated or arbitrations were done or some kind of ruling, and write grants temporarily but still be part of the police department with the supervisor as Captain Richardson at the time.

Plaintiff did what was asked of him and wrote grant applications which resulted in the Police Department receiving over $250,000.00. Id. ¶ 53.

According to Plaintiff, despite his beneficial work, Defendants continued to harass him. Id. ¶ 54. They did not assign him duties which would normally be performed by the CPO, and they did not provide him with the equipment or identification required for the position. Id. Their actions disregarded numerous arbitration awards and prior custom. Id. Plaintiff was required to punch-in at the police station, ostensibly to receive assignments (although none were ever given), and then proceed to the Division of Inspections. Dep. at 62-63. With the exception of a single grant seminar which Plaintiff was directed to attend, Plaintiff was not allowed to leave the Division of Inspections and performed all his functions at that location.[8] Id. at 63.

In addition to respiratory problems, Plaintiff developed skin rashes. Id. at 64. Due to these maladies, Plaintiff sometimes would be five to ten minutes late for work. Id. The Town required him to deduct this time from his "comp time" (apparently time off for which Plaintiff was paid). Id. at 65.

Plaintiff worked at the Division of Inspections from August of 2002 to April of 2005. Dep. at 22; see also Plaintiff's Aff. During this period he was confined to an office space for seven hours a day and not given CPO duties. VAC ¶ 56. The building was damp, moldy, musty, and dusty, exacerbating his medical condition, and the Town was aware of this. Id. ¶ 57. In addition, one half of his lunch hour was taken away in violation

---

Dep. at 61-62.

[8] At some point, Plaintiff apparently was allowed to leave the police station because he also alleges that Defendants took "took away a vehicle for no legitimate business reason and reassigned [him] to do clerical work for another [Town Department]." VAC ¶ 55.

of the collective bargaining agreement governing Plaintiff's employment. Id. ¶ 59.

While working at the Division of Inspections, on or about September 5, 2003, Plaintiff requested in writing that he be given the duties of CPO as outlined in the various arbitration awards.[9] Id. ¶ 61. After making this request, Plaintiff was suspended for ten days without pay. Id. ¶ 62. Plaintiff filed a grievance regarding this suspension, and or about December 9, 2003, it was vacated. Id. ¶ 64. However, Plaintiff alleges that he still lost ten days of pay.[10] Id. ¶ 65.

On or about March 25, 2004, Plaintiff was again suspended, this time for thirty days without pay. Id. ¶ 66. Plaintiff testified that it resulted from an incident in the police station when he asserted that a citizen's complaint about stalking was a matter which initially could be handled by the CPO and Defendant Leo Perrotta, the Town's Director of Planning, insisted that it was not. Dep. at 41-43.

Plaintiff returned to work from the suspension on or about May 10, 2004.[11] VAC ¶ 67. Defendants persisted in their refusal to allow him to perform CPO duties, and they took away from him

---

[9] It appears from the VAC that there are at least three arbitration awards which supported Plaintiff's request: the December 17, 1990, decision which required that the position of CPO be filled by a member of Local 1033, see VAC ¶ 20; the decision, apparently resulting from Local 1033's May 1993 grievance, which required that Plaintiff be awarded the position of CPO, see id. ¶¶ 28-29; and the decision rendered on or about November 21, 1999, see id. ¶ 37, which is still pending on appeal, see id. ¶ 40.

[10] It is not entirely clear from the VAC and from Plaintiff's deposition how he lost ten days of pay even though the suspension was vacated. See VAC ¶¶ 64-65; see also Dep. at 37-39.

[11] At his deposition, Plaintiff fixed the time he returned from his "last suspension," Dep. at 46, as being "in the summer of 2004, near July," id. Whether Plaintiff returned from this suspension in May or "near July" of 2004, does not affect the Court's resolution of the instant Motion.

certain unspecified duties. VAC ¶¶ 67-68. In the VAC, Plaintiff alleges that the Town has refused to order the Police Department to stop the harassment and to conform to the arbitration decisions.[12] Id. ¶ 67.

**Travel**

Plaintiff filed the instant action on July 20, 2004, and he filed his VAC on November 8, 2004. See Docket. His VAC contains four counts. Count I is brought pursuant to 42 U.S.C. § 1983, VAC ¶¶ 69-73, and alleges that Defendants have violated and are continuing to violate Plaintiff's rights as guaranteed under the Fourteenth Amendment by depriving him of a protected property interest in his employment without due process of law, id. ¶ 71. Plaintiff specifically alleges that the Town has engaged in a pattern of violating Plaintiff's rights through its custom and policy throughout Plaintiff's employment and that this pattern is continuing. Id. ¶ 72. Count II alleges a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.[13] Id. ¶¶ 74-78. Plaintiff charges that Defendants have engaged in a pattern of discrimination and retaliatory conduct against him "because of his documented medical condition,"[14] id. ¶ 75, and his request for reasonable accommodations, id. Count III charges Defendants with intentional infliction of emotional distress. Id. ¶¶ 79-81. In Count IV Plaintiff seeks an award of

[12] In April of 2005, Plaintiff's work place was moved from the Division of Inspections back to the police department. Dep. at 22. However, the Town has continued not to assign him duties consistent with his position as CPO. See id. at 46-47.

[13] Statutory citation by the Court.

[14] Other than references to "severe physical and psychological health problems," VAC ¶ 43, Plaintiff does not identify in the VAC what "his documented medical condition ...," id. ¶ 75, is. At his deposition, Plaintiff testified that his medical condition is "severe allergies." Dep. at 14.

punitive damages. Id. ¶¶ 82-83.

Defendants filed their Motion for Summary Judgment on November 1, 2005. Plaintiff's Objection to Defendants' Motion for Summary Judgment (Doc. #25) was filed on December 21, 2005. Following the hearing on January 19, 2006, the Court took the Motion under advisement.

**Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kearney v. Town of Wareham, 316 F.3d 18, 21 (1st Cir. 2002)(quoting Fed. R. Civ. P. 56(c)); accord ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)(quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)(citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts

offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." Gannon v. Narragansett Elec. Co., 777 F. Supp. 167, 169 (D.R.I. 1991)(citation and internal quotation marks omitted).

The non-moving party, however, may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d at 53 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d at 94 (quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993))(alteration in original)(internal quotation marks omitted).

**Discussion**

**I. Statute of Limitations**

**A. Three Year Statute**

Defendants seek "partial summary judgment on any and all claims arising before November 2001 (more than three (3) years before the filing of the instant complaint) ... in that the statute of limitations on such claims has passed." Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defendants' Mem.") at 5; see also Fed. R. Civ. P. 56. Defendants note that a three year statute of limitations applies to Plaintiff's claims under § 1983, the ADA, and state law (for

intentional infliction of emotional distress). Defendants' Mem. at 5 (citing Nieves-Márquez v. Commonwealth of Puerto Rico, 353 F.3d 108, 118 (1st Cir. 2003)("plaintiffs' federal law claims-under ... the ADA ... and § 1983 ... borrow the most analogous statute of limitations from [the forum state's] law, provided it does not conflict with federal law")); see also Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 352 (1st Cir. 1992)("The Supreme Court directs federal courts adjudicating civil rights claims under 42 U.S.C. § 1983 to borrow the statute of limitations applicable to personal injury actions under the law of the forum state.")(quoting Street v. Vose, 936 F.2d 38, 39 (1st Cir. 1991)(per curiam)); Walden, III, Inc. v. Rhode Island, 576 F.2d 945, 946-47 (1st Cir. 1978)(affirming that Rhode Island's three year statute of limitations for personal injury actions applies to civil rights actions brought under 42 U.S.C. § 1983); Adams v. Town of Burrillville, 249 F.Supp.2d 151, 154 (D.R.I. 2003)(holding that claims for constitutional deprivations and intentional infliction of emotional distress are subject to three year statute of limitations). Citing the fact that "[t]he instant Complaint was filed on November 6, 200[4][15]," Defendants' Mem. at 5, Defendants contend that "any actions prior to November 6, 2001, are time barred and summary judgment on any such incidents should be granted," id.; see also Jensen v. Frank, 912 F.2d 517, 520 (1st Cir. 1990)("Issues of timely filing may be decided under Rule 56 if the relevant facts are sufficiently clear.").

**B. Continuing Violation Doctrine**

Plaintiff agrees that Defendants correctly cite the

---

[15] The Court corrects a typographical error in Defendants' memorandum which states that "the instant Complaint was filed on November 6, 2001." Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defendants' Mem.") at 5.

prevailing law relative to the statute of limitations, but relies upon the continuing violation doctrine to avoid the preclusive effect of the statute. See Plaintiff's Memorandum of Law ("Plaintiff's Mem.") at 8. The application of the continuing violation doctrine was clarified by the Supreme Court in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061 (2002). See Rivera v. Puerto Rico Aqueduct & Sewers Auth., 331 F.3d 183, 188 (1st Cir. 2003)(noting that "[t]he Supreme Court has recently elaborated on the meaning of the term 'continuing violation'"); see also Crowley v. L.L. Bean, Inc., 303 F.3d 387, 406 (1st Cir. 2002)(stating that "Morgan supplants our jurisprudence on the continuing violation doctrine in hostile work environment claims, making it no longer necessary to distinguish between systemic and serial violations"); cf. Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003)(stating that "the Supreme Court's recent pronouncement ... has effected fundamental changes to the [continuing violation] doctrine").

In Morgan, the Supreme Court "held that when an employee seeks redress for discrete acts of discrimination or retaliation, the continuing violation doctrine may not be invoked to allow recovery for acts that occurred outside the filing period." Sharpe v. Cureton, 319 F.3d 259, 267 (6th Cir. 2003)(citing Morgan, 536 U.S. at 113, 122 S.Ct. at 2072); accord Campbell v. BankBoston, N.A., 327 F.3d 1, 11 (1st Cir. 2003); Vesprini v. Shaw Contract Flooring Servs., Inc., 315 F.3d 37, 42 n.4 (1st Cir. 2002); Miller v. New Hampshire Dept. of Corr., 296 F.3d 18, 22 (1st Cir. 2002). The Court explained that:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Morgan can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

Morgan, 536 U.S. at 114, 122 S.Ct. at 2073; see also id. ("While Morgan alleged that he suffered from numerous discriminatory and retaliatory acts from the date that he was hired through ... the date that he was fired, only incidents that took place within the timely filing period are actionable."); Davidson v. America Online, Inc., 337 F.3d 1179, 1184 (10th Cir. 2003)("In Morgan, the Supreme Court held that a continuing violation theory of discrimination is not permitted for claims against discrete acts of discrimination, such as termination, failure to promote, denial of transfer, or a refusal to hire.").

Thus, under Morgan, except for hostile work environment claims which the Court found to be fundamentally different,[16] Campbell v. BankBoston, N.A., 327 F.3d 1, 11 (1st Cir. 2003) (citing Morgan, 536 U.S. at 115-17, 122 S.Ct. at 2073-75), discrete discriminatory and retaliatory acts are not actionable if time barred even when they are related to acts alleged in timely filed charges, see Campbell v. BankBoston, N.A., 327 F.3d at 11 (stating such as to "discrete discriminatory acts")(quoting Morgan, 536 U.S. at 113, 122 S.Ct. at 2072); Vesprini v. Shaw Contract Flooring Servs., Inc., 315 F.3d at 42 n.4 (citing Morgan, 536 U.S. at 113, 122 S.Ct. at 2072); see also Dressler v. Daniel, 315 F.3d 75, 79 (1st Cir. 2003)(stating "that discrete

---

[16] Plaintiff has not alleged a hostile work environment claim. See O'Rourke v. City of Providence, 235 F.3d 713 (1st Cir. 2001). Such a claim requires proof (1) that the plaintiff is a member of a protected class; (2) that he or she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. Id. at 728.

discriminatory or retaliatory acts must be filed within the appropriate time period, but that in hostile work environment claims, the time limitation will not exclude acts that are part of the same unlawful employment practice if at least one act falls within the time period")(citing Morgan, 536 U.S. at 113, 122 S.Ct. at 2072).

Although Morgan involved the timeliness of a plaintiff's Title VII claims,[17] its holding has been extended to § 1983 claims. See Hildebrandt v. Illinois Dept. of Natural Res., 347 F.3d 1014, 1036 n.18 (7th Cir. 2003)("The Supreme Court's ruling in [Morgan], although discussing the continuing violation doctrine in the Title VII context, applies equally to § 1983 cases."); Sharpe v. Cureton, 319 F.3d 259, 267 (6th Cir. 2003) ("We can find no principled basis upon which to restrict Morgan to Title VII claims, and we therefore conclude that the Supreme Court's reasoning must be applied to the firefighter's § 1983 claims.")(footnote omitted); RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1058-61 (9th Cir. 2002)(applying Morgan to § 1983 claims). Morgan has also been extended to cases brought under the ADA. See Davidson v. America Online, Inc., 337 F.3d at 1184 ("We can find no basis upon which to restrict the Court's holding to Title VII, and we therefore conclude that the Court's reasoning in Morgan must be applied to cases brought

---

[17] Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. S 2000e-2(a)(1).

Crowley v. L.L. Bean, Inc., 303 F.3d 387, 394 (1st Cir. 2002) (alterations in original).

under the ADA."); Zankel v. Temple Univ., Civil Action No. 05-2760, 2006 WL 1083600, at *5 (E.D. Pa. Apr. 24, 2006)(applying Morgan to ADA claim and stating that "each time [p]laintiff made a request for a reasonable accommodation that went denied, a new clock for filing charges began"); Voisin v. Georgia Gulf Corp., 245 F.Supp.2d 853, 855 (M.D. La. 2002)(applying Morgan to ADA claim). Accordingly, based on the foregoing law, I find that the holding in Morgan applies to Plaintiff's § 1983 claim (Count I) and ADA claim (Count II).

Having determined that Morgan applies to Plaintiff's § 1983 and retaliation claims (Counts I and II), the Court must decide whether the acts about which Plaintiff complains are "discrete acts." Morgan, 536 U.S. at 114, 122 S.Ct. at 2073. If they are, only discrete acts occurring on or after November 6, 2001, are actionable. See id.

Plaintiff's chief complaint is that Defendants refused to assign him the duties of CPO or to allow him to perform those duties and required him instead to perform no duties or inappropriate duties. See VAC ¶¶ 27, 32-35, 49, 54, 56, 60-61, 67; see also Dep. at 32-33, 40-42, 45-46, 49-55, 57, 59, 62. A job assignment is a discrete act. See Gobin v. New York City Health & Hosps. Corp., No. 04 Civ. 3207(WHP), 2006 WL 2038621, at *4 (S.D.N.Y. July 19, 2006)("[D]iscrete acts include allegedly discriminatory transfers, job assignments and non-promotions, and failures to compensate adequately.")(quoting Bailey v. Synthes, 295 F.Supp.2d 344, 354 (S.D.N.Y. 2003))(alteration in original); Benjamin v. Brookhaven Science Assocs., LLC, 387 F.Supp.2d 146, 154 (E.D.N.Y. 2005)("[I]t is well-settled in the Second Circuit that alleged failures to compensate adequately, transfers, job assignments and promotions are discrete acts and, if untimely, cannot form the basis of a continuing violation claim."); Mitravich v. Occidental Chem. Corp., No. 97-CV-0885E(F), 2001 WL

118578, at *6 (W.D.N.Y. Jan. 8, 2001)(describing defendant's failure to continue to assign plaintiff work as a "discrete incident[]"); see also Rivera v. Puerto Rico Aqueduct & Sewers Auth., 331 F.3d 183, 188 (1st Cir. 2003)("The [Morgan] Court made plain that '[d]iscrete acts such as termination, failure to promote, denial of *transfer* or refusal to hire ... constitute[] a separate actionable unlawful employment practice.'")(second, third, and fourth alterations in original); Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2nd Cir. 1997)("Completed acts such as a termination through discharge or resignation, a job transfer, or discontinuance of a particular job assignment, are not acts of a continuing nature.")(internal quotation marks omitted).

Defendants' action in refusing to assign Plaintiff the duties of CPO or to allow him to perform those duties are equivalent to a job assignment, denial of transfer, or refusal to promote, all of which have been found to be discrete acts. See Morgan, 536 U.S. at 114, 122 S.Ct. at 2073 (stating that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify"); Rivera v. Puerto Rico Aqueduct & Sewer Auth., 331 F.3d at 188; Miller v. New Hampshire Dep't of Corr., 296 F.3d 18, 22 (1st Cir. 2002); Lightfoot v. Union Carbide Corp., 110 F.3d at 907. Accordingly, I find that these actions by Defendants are discrete acts, see Gobin v. New York City Health and Hosps. Corp., 2006 WL 2038621, at *4; Benjamin v. Brookhaven Science Assocs., LLC, 387 F.Supp.2d at 154, and that they are actionable only if they occurred on or after November 6, 2001.

Plaintiff also complains about the locations where he was assigned to work, see e.g., VAC ¶ 42 ("an unhealthy and dangerous work area within the police department"); id. ¶ 51 ("a damp, and moldy at least 100 year old historic fire station"), the

restrictions under which he was required to labor, see e.g., id. ¶ 32 ("monitoring every move Plaintiff made"); id. ¶ 33 (prohibiting Plaintiff "from talking to anyone for more than 60 seconds"); id. (restricting his freedom of movement), and the harassment to which he was subjected,[18] see e.g., VAC ¶¶ 47-49, 52-53; Dep. at 35 ("somewhat of a daily busting up"), 45-46, 51. Applying the reasoning of the cases cited above, the Court finds that the assignment of Plaintiff to specific work areas, the imposition of restrictions on his activities, and the harassment about which he complains constitute discrete acts and that they are actionable only if they occurred on or after November 6, 2001.

To the extent that Plaintiff relies upon any suspension or other act of discipline by Defendants, I find Defendants' actions in suspending Plaintiff or otherwise disciplining him to be discrete acts. See Gobin v. New York City Health & Hosps. Corp., 2006 WL 2038621, at *4 (finding alleged demotion and false "Statement of Charges" to be discrete acts that occurred outside the limitations period).

The Court's conclusion that the above described actions which occurred prior to November 6, 2001, constitute discrete acts is further bolstered by two additional facts. First, Plaintiff filed grievances regarding most of the claimed violations, see Dep. at 34 ("Those are all grievable and I believe I did grieve them."); DSUF ¶¶ 6-7, 10; VAC ¶¶ 36, 49; id.

---

[18] Plaintiff testified that most of the statements which he considered to be harassment were made from 1994 to 2001. Dep. at 34. From 2001 forward, Plaintiff described the harassment as being "a general lack of recognition for the CPO position .... I was given clerical work. Also ... people would not call me by the title of CPO, not recognize a CPO when members of the public would come through." Id. at 32. As of September 8, 2005, the date he was deposed, Plaintiff testified that the harassment had basically ceased except for one individual in the Police Department. Id. at 71-72.

¶ 50 ("Plaintiff continued to file grievances to remedy the Defendants' continuing violations of his rights"), and he engaged in "numerous," VAC ¶ 54, arbitrations, id. ¶¶ 36-37.[19] The fact that these matters were the subject of grievances and arbitrations is further evidence that they were discrete acts.

Second, the alleged violations which occurred prior to November 6, 2001, were separated by two long gaps during which Plaintiff was not working because he had filed claims for worker's compensation benefits. Plaintiff was out of work from March 1996 to September 1998, a period of two and a half years, and again from March 1999 to March 2001. VAC ¶¶ 45, 47. These lengthy interruptions in Plaintiff's attendance adds to the discreteness of the incidents which allegedly occurred during the intervals which preceded each absence. They readily lend themselves to providing points of demarcation.

For the reasons stated above, I find that to the extent Plaintiff's claims are based on actions occurring prior to November 6, 2001, they are time barred. Accordingly, as to such claims, summary judgment should be granted to Defendants. I so recommend.

**II. Count I (§ 1983 Due Process Claim)**

"The Fourteenth Amendment prohibits a state from depriving any person of 'life, liberty, or property, without due process of law.' U.S. Const. amend. XIV, § 1. That proscription applies fully to a state's political subdivisions, including

---

[19] Plaintiff objects to the words "almost all" in DSUF ¶ 10 ("Almost all of the actions plaintiff relies upon to support his claim in the instant case were the topic of past grievances or workers' compensation claims."). He indicates that there were "numerous" actions by Defendants which were not covered by grievance or worker's compensation procedures. See Plaintiff's Rule 12.1 Statement of Disputed Facts ("PSDF") at 2. Accepting the PSDF as true, it is indisputable that he filed multiple grievances prior to November 6, 2001. See VAC ¶¶ 36, 50; Dep. at 31, 33, 50-51.

municipalities and municipal agencies." DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005).

> The Due Process Clause has both procedural and substantive components. In its procedural aspect, due process ensures that government, when dealing with private persons, will use fair procedures. In its substantive aspect, due process safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them.

DePoutot v. Raffaelly, 424 F.3d at 118 (internal citations omitted).

Plaintiff's VAC does not indicate whether he is alleging a procedural or a substantive violation of his due process rights. See VAC ¶¶ 69-73, particularly ¶ 71 (alleging that "Plaintiff has a protected property interest in his employment which is being deprived without due process"). In his memorandum, Plaintiff appears to argue that both components of the Clause have been violated. See Plaintiff's Mem. at 11 (contending that Plaintiff has no adequate remedy under state law); id. at 12 (asserting that a fact finder could find that "the actions of the Defendants, coupled with their motive, shocks the conscience"). The Court, therefore, will consider both possibilities.

In order to establish a procedural due process claim under § 1983, a plaintiff must allege first that he has a property interest as defined by state law and second that the defendants, acting under color of state law, deprived him of that property interest without constitutionally adequate process. SFW Arecibo, Ltd. v. Rodriguez, 415 F.3d 135, 139 (1st Cir. 2005); Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 53 (1st Cir. 2005); see also Rumford Pharmacy, Inc. v. City of East Providence, 970 F.2d 996, 999 (1st Cir. 1992)("A sufficient procedural due process claim must allege 'that [the plaintiff] was deprived of constitutionally protected property because of defendants'

actions, and that the deprivation occurred without due process of law.'")(quoting Roy v. City of August, Me., 712 F.2d 1517, 1522 (1st Cir. 1983))(alteration in original). Additionally, the complaint must allege that available remedies are inadequate to address the deprivation. See Ramirez v. Arlequin, 447 F.3d 19, 25 (1st Cir. 2006)(affirming dismissal of procedural due process claims where plaintiffs failed to allege that there was no complete and adequate remedy available under state law for breach of contract); Rumford Pharmacy v. City of East Providence, 970 F.2d at 999 (describing as "critically important" allegation that remedies available under Rhode Island law were inadequate to redress the deprivation resulting from eight month delay in processing plaintiff's license transfer application); id. ("The Supreme Court has explained the critical importance attached to the requirement that a procedural due process claimant allege the unavailability of constitutionally-adequate remedies under state law.")(citing Zinerman v. Burch, 494 U.S. 113, 125-26, 110 S.Ct. 975, 983-84 (1990)).

Plaintiff alleges in the VAC that he "has a protected property interest in his employment which is being deprived without due process." VAC ¶ 71. In his memorandum he indicates that the property interest at stake is that "Plaintiff has been suspended and lost money due to the actions of the Defendants." Plaintiff's Mem. at 12. According to the VAC, Plaintiff was suspended twice, for ten days during the latter half of 2003, see VAC ¶ 62, and again for thirty days in March of 2004, id. ¶ 66. However, Plaintiff testified that he filed grievances regarding both of these suspensions, see Dep. at 37-38, 43, and that they were both resolved by agreement between the parties, see id.[20]

---

[20] Plaintiff testified that the first suspension was vacated on December 9, 2003, as a result of a "stipulated agreement," Dep. at 37, between the parties. He "believe[d]," Dep. at 37, that the lost pay

Thus, Plaintiff had an adequate state remedy for this deprivation through the grievance process afforded by his union's collective bargaining agreement. Accordingly, the suspensions cannot be the basis for a procedural due process violation. See Wojcik v. Massachusetts State Lottery Comm'n, 300 F.3d 92, 102 (1st Cir. 2002)("[T]he full arbitration hearing afforded by the collective-bargaining agreement was more than sufficient to satisfy the requirement for a post-deprivation hearing."); O'Neill v. Baker, 210 F.3d 41, 50 (1st Cir. 2000)(holding that arbitration of public employee's termination grievance satisfies the requirements of due process); Rumford Pharmacy, Inc. v. City of East Providence, 970 F.2d at 999 ("If the federal courts were to entertain civil rights complaints based on procedural deprivations for which adequate state remedies exist, 'every disgruntled applicant could move [its procedural grievances] into federal courts ...[,] any meaningful separation between federal and state jurisdiction would cease to hold and forum shopping would become the order of the day.")(quoting Roy v. City of Augusta, Me., 712 F.2d 1517, 1522 (1st Cir. 1983))(alterations in original).

Plaintiff argues that because the Town's appeal of the 1999 favorable arbitration award has been pending before the Superior Court since 1999, he does not have an adequate remedy at state law.[21] See Plaintiff's Mem. at 11 (citing Rumford Pharmacy, Inc.

---

was among the items addressed in the agreement, id. The second suspension was also resolved through a stipulation agreement pursuant to which after one year the suspension would be rescinded and Plaintiff would "get the money back." Id. at 44.

Plaintiff also testified that his first claim for worker's compensation was resolved by the Town agreeing to pay him money. Dep. at 10-12. As previously noted, he was unsuccessful on his second claim for worker's compensation. Dep. at 13.

[21] Plaintiff testified that Judge Silverstein heard argument concerning the Town's appeal in 1999, but that the court file was subsequently lost and "they were now retrieving the file from wherever

v. City of East Providence, 970 F.2d 996 (1992)). However, Plaintiff does not identify any constitutionally protected property interest which is at stake in this arbitration. To the extent that he contends that the type of duties which he is assigned while occupying the position of CPO or the location in which he is required to perform those duties is a constitutionally protected property interest, Plaintiff cites no authority in support of such a proposition. Presumably his argument is that under Rhode Island law the collective bargaining agreement creates a reasonable expectation that, having been awarded the position of CPO, he will perform the duties usually assigned to the CPO in an appropriate location and that this expectation gives him a constitutionally protected property interest. Cf. Perkins v. Bd. of Dirs. of Sch. Admin. Dist. No. 13, 686 F.2d 49, 51 (1st Cir. 1982)("A public employee has a constitutionally protected interest in continued employment where he has a reasonable expectation, arising out of state statute, rules or the contract, that he will continue to be employed."); see also Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 9 (1st Cir. 2003)(finding no violation of procedural due process where plaintiff could not "demonstrate that Puerto Rico's public employment law created any reasonable expectation, arising out of a statute, policy, rule, or contract, that she would continue to perform supervisory duties")(internal quotation marks omitted); Wojcik v. Massachusetts State Lottery Comm'n, 300 F.3d at 102 (concluding that plaintiff had constitutionally protected property interest in continued employment by virtue of collective bargaining agreement). Plaintiff presumably also contends that Defendants' failure to allow him to perform the duties of CPO after he was awarded that position constitutes a continuing

---

it was." Dep. at 70.

violation. Cf. Decker v. Hillsborough County Attorney's Office, 845 F.2d 17, 22 (1st Cir. 1988)(suggesting that it could be argued that defendants' flagrant disobedience of a court order requiring them to return plaintiff's property "was a denial of due process resulting in a continuing property deprivation").

Assuming that Plaintiff has a constitutionally protected interest in performing the duties of CPO, the VAC still fails to allege that constitutionally adequate remedies are unavailable under state law to address the deprivation of this interest. This pleading omission alone warrants denial of Plaintiff's procedural due process claim. See Rumford Pharmacy, Inc. v. City of East Providence, 970 F.2d at 999. In fact, the VAC actually reflects that Plaintiff has an adequate remedy under state law, namely filing a grievance pursuant to the collective bargaining agreement and taking the matter to arbitration, and that Plaintiff successfully availed himself of this remedy. See VAC ¶¶ 36-39. Plaintiff was awarded "a make whole remedy of $30,000.00 plus 12% interest as of November 21, 1999[.]" VAC ¶ 39; cf. Wojcik v. Massachusetts State Lottery Comm'n, 300 F.3d 92, 102 (1st Cir. 2002).

Plaintiff argues that this cannot constitute an adequate remedy because the Town's appeal of the arbitration award has been pending in the Superior Court "with no decision for over five years." Plaintiff's Mem. at 11. "Although extraordinarily long delays may render a postdeprivation remedy inadequate," Cronin v. Town of Amesbury, 81 F.3d 257, 260 (1st Cir. 1996), delay by itself does not establish that the remedy is unavailable, see id. (noting that despite the almost three-year delay, the possibility of reinstatement remained available to plaintiff). Here the possibility that the favorable arbitration award, which includes 12% interest, will be upheld still exists. More importantly, the record is devoid of any evidence that

Plaintiff ever took any steps to call to Judge Silverstein's attention that he had not rendered a decision on the pending arbitration. To the extent that Plaintiff relies upon the delay in deciding the appeal of the 1999 arbitration award as a basis for establishing that he has no adequate remedy at state law, Plaintiff must show that he made reasonable efforts to obtain a decision and that notwithstanding those efforts no decision has been forthcoming. Plaintiff may not simply remain quiet while interest grows on a monetary award in his favor and then cite the lack of action as evidence that he has no adequate remedy at state law. Cf. Rumford Pharmacy, Inc. v. City of East Providence, 970 F.2d 996, 999 (1st Cir. 1992)(explaining that determination of whether constitutional violation has occurred involves inquiry into "the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivation by statute or tort law"). In other words, Plaintiff may not satisfy the requirement that he lacks an adequate remedy at state law because of inordinate delay in obtaining a decision from an administrative or judicial body without showing that he has made reasonable efforts to obtain such a decision.

Accordingly, to the extent that Plaintiff relies upon the Superior Court's delay in deciding the Town's appeal of the 1999 arbitration award, such argument is rejected. Therefore, I find that Plaintiff's procedural due process claim must fail because the VAC does not allege the lack of a constitutionally adequate remedy at state law for the claimed deprivation and also because such a remedy exists through the mechanism of the collective bargaining agreement. Plaintiff has not shown that, despite reasonable diligence on his part, he has been unable to obtain a decision from the Superior Court regarding the Town's appeal of the 1999 arbitration award.

Turning now to Plaintiff's substantive due process claim, "it is only when some *basic and fundamental principle* has been transgressed that 'the constitutional line has been crossed.'" Santiago de Castro v. Morales Medina, 943 F.2d 129, 131 (1st Cir. 1991)(quoting Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990)); id. ("substantive due process 'affords only those protections "so rooted in the traditions and conscience of our people as to be ranked as fundamental"'")(quoting Michael H. v. Gerald D., 491 U.S. 110, 122, 109 S.Ct. 2333, 2342 (1989) (plurality opinion)(quoting Synder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332 (1934))). To establish a violation of substantive due process requires conduct which "is so extreme and egregious as to shock the contemporary conscience." DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005).

The "determination of whether state conduct 'shocks the conscience' is necessarily fact-specific and unique to the particular circumstances in which the conduct occurred ...." Cruz-Erazo v. Rivera-Montañez, 212 F.3d 617, 623 (1st Cir. 2000). In determining whether this standard is met, the First Circuit has stated that:

> "[T]he requisite arbitrariness and caprice" for a conscience-shocking executive action "must be stunning, evidencing more than humdrum legal error." Amsden v. Moran, 904 F.2d 748, 754 n.5 (1st Cir. 1990). Mere violations of state law, even violations resulting from bad faith, do not necessarily amount to unconstitutional deprivations of substantive due process. Id. at 757. Courts regularly have required something more egregious and more extreme.

DePoutot v. Raffaelly, 424 F.3d at 119. Examples of conduct that the First Circuit has found to be conscience shocking include the intentional "framing of innocent citizens for serious crimes they did not commit," Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004), and cases involving "extreme or intrusive physical

contact," Souza v. Pina, 53 F.3d 423, 427 (1st Cir. 1995); see also Harrington v. Almy, 977 F.2d 37, 43-44 (1st Cir. 1992) (requiring a suspended police officer to undergo a penile plethysmograph as a condition of reemployment); id. at 43 (noting that "approaches to substantive due process analysis have focused on state action undertaking unwarranted manipulations of an individual's body")(footnote omitted); Ramirez v. Arlequin, 357 F.Supp.2d 416, 427 (D.P.R. 2005)("Deprivations of 'identifiable liberty or property interests' actionable under the substantive modality of the due process clause 'generally have something to do with "matters relating to marriage, family, procreation, and the right to bodily integrity" rather than property or employment issues.'")(quoting Learnard v. Inhabitants of Van Buren, 164 F.Supp.2d 35, 41 n.2 (D. Me. 2001)(quoting Albright v. Oliver, 510 U.S. 266, 272, 114 S.Ct. 807 (1994))), rev'd in part on other grounds, 447 F.3d 19 (2006); cf. Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209 (1952)(forcing an emetic solution through a tube into petitioner's stomach against his will, causing him to vomit, "is conduct that shocks the conscience").

Conduct may be "despicable and wrongful," Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991), but still not rise to the level of conscience shocking, see id. (finding police officer's verbal threat to young children that they would never see their mother's live in companion again and officer's refusal to allow the children to "hug and kiss" him goodbye was not sufficient to "shock the conscience"); see also Cruz-Erazo v. Rivera-Montañez, 212 F.3d at 622-23 (finding that months of harassment by police officers which included threats of physical violence, insults, the filing of unjustified burglary charge against plaintiff, and the pushing of plaintiff's pregnant daughter who two days thereafter suffered a miscarriage, presented a close question but did not rise to the level of shocking the conscience); Souza v.

Pina, 53 F.3d at 427 (finding that action of district attorney and members of his staff in conducting numerous press conferences and other media interviews in which they linked petitioner's son to killings of nine young women did not shock the conscience even though petitioner's son subsequently killed himself); cf. Santiago de Castro v. Morales Medina, 943 F.2d 129, 131 (1st Cir. 1991)(finding that verbal harassment from supervisor which caused Plaintiff to become ill was not conscience shocking).

Applying the foregoing law to Plaintiff's case, the Court concludes that the conduct attributed to Defendants does not rise to conscience shocking level. Plaintiff's complaints are somewhat similar to those in Santiago de Castro[22] with the added components that Plaintiff has alleged that he was required to work in uncomfortable environments which aggravated his allergies, that he was not allowed to perform the duties of CPO, that he was suspended on at least two occasions, that he was required to punch-in and out for breaks, and that his lunch was reduced from an hour to half an hour. These additional

---

[22] In Santiago de Castro the plaintiff alleged that during a six month period she was "continuously and consistently harassed ... in many ways by her supervisor, Morales." Santiago de Castro v. Morales Medina, 943 F.2d 129, 130 (1st Cir. 1991)(alteration in original)(internal quotation marks omitted). Among the more specific allegations against Morales were that he:

> berated [plaintiff] in the presence of her students; ordered her, in a "crass and gross tone," to admit a student she had turned away from her class; rendered an oral evaluation (which he refused to put in writing) that [plaintiff] was not a good teacher; and made repeated calls to [plaintiff]'s co-workers "defaming [plaintiff] and creating an uncomfortable environment for her to work."

Id. The plaintiff claimed that as a result of the harassment she "became ill with an anxiety disorder with depressive characteristics related to her employment and that she has suffered extreme mental anguish ... humiliation, fear, apprehension, anxiety and other deep and long-lasting moral, mental and spiritual damages." Id. (alteration in original)(internal quotation marks omitted).

considerations do not alter the Court's conclusion that Plaintiff falls short of satisfying the "threshold," DePoutot v. Raffaelly, 424 F.3d at 118, requirement to establish a substantive due process violation, cf. City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 200, 123 S.Ct. 1389, 1397 (2003)(Scalia, J., concurring)("It would be absurd to think that all 'arbitrary and capricious' government action violates substantive due process-even, for example, the arbitrary and capricious cancellation of a public employee's parking privileges. The judicially created substantive component of the Due Process Clause protects, we have said, certain 'fundamental liberty interest[s]' from deprivation by the government, unless the infringement is narrowly tailored to serve a compelling state interest.")(quoting Washington v. Glucksberg, 521 U.S. 702, 721, 117 S.Ct. 2258 (1997))(alteration in original). As Plaintiff has failed to show that Defendants' conduct "shock[s] the contemporary conscience," DePoutot v. Raffaelly, 424 F.3d at 118, it is unnecessary for the Court to proceed to the next step and "examine what, if any, constitutional right may have been violated by the conscience-shocking conduct and identify the level of protection afforded to that right by the Due Process Clause," id. (footnote omitted).[23]

Having determined that Plaintiff cannot satisfy the requirements to prevail on either procedural or substantive due process claims, the Motion for Summary Judgment should be granted as to Count I. I so recommend.

---

[23] Although it is unnecessary for the Court to proceed to this second step, it appears doubtful that it could be answered in Plaintiff's favor. Cf. Santiago de Castro v. Morales Medina, 943 F.2d 129, 131 (1st Cir. 1991)(finding no support for plaintiff's contention "that, important as it is, her right to pursue her employment free from emotional health risks resulting from her supervisor's verbal harassment warrants substantive due process protection under the United States Constitution").

## III. ADA Claim (Count II)

### A. Exhaustion of Administrative Remedies

"[T]he ADA mandates compliance with the administrative procedures specified in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and that, absent special circumstances ... such compliance must occur before a federal court may entertain a suit that seeks recovery for an alleged violation of Title I of the ADA." Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 277 (1st Cir. 1999); see also id. at 278 ("[A] claimant who seeks to recover for an asserted violation of Title I of the ADA ... first must exhaust administrative remedies by filing a charge with the EEOC, or alternatively, with an appropriate state or local agency, within the prescribed time limits."). In Rhode Island, the administrative claim must be filed within 300 days after the alleged discrimination. See Romano v. A.T. Cross Co., 39 F.Supp.2d 143, 146 (D.R.I. 1999)("Rhode Island is a deferral state and the 300-day period applies."). "The date that 300-day clock begins to tick is determined by reference to federal law. Under federal law, accrual of a discrimination claim commences when a plaintiff knows, or has reason to know, of the discriminatory act that underpins his or her cause of action." Id. (citations omitted).

Plaintiff apparently does not dispute that he did not file a timely claim with the Equal Employment Opportunity Commission ("EEOC") or an equivalent agency within the requisite time period prior to filing suit. See Plaintiff's Mem. at 9. However, he argues that the charge filing requirement should be equitably tolled because "there was an understanding that he would be moved to a better location and given better duties if he helped clean up the grant situation ...," id. (citing Plaintiff's deposition testimony generally at 61-62), and also because "he had been

suspended twice for trying to assert his rights," id. Thus, Plaintiff contends that "[t]he promise of better quarters, coupled with the threat of retaliation, certainly could rise to the level of equitable tolling that is discussed in Bonilla." Id.

The Court notes first that there is nothing in the record to indicate that Plaintiff has ever filed a charge with the EEOC or the Rhode Island Commission for Human Rights concerning his ADA claim. While equitable tolling may be used to excuse a late filing, it does not permit a plaintiff to dispense with the requirement altogether. Indeed, in determining whether to allow equitable tolling a relevant consideration is the length of the period for which tolling is sought. Here Plaintiff has provided no information in that regard.

Even assuming that Plaintiff filed a belated claim with the appropriate administrative agency, the Court is unpersuaded by Plaintiff's argument for equitable tolling. Plaintiff implies that Defendants misled him with the promise of a better job location, but the testimony he cites to support this contention, Dep. at 61-62, does not do so.[24] Plaintiff made no reference to a promise that he would receive a better job location if he rectified the grant problems. He only mentioned that there was agreement that he would work in the Division of Inspections "until a suitable job description was negotiated or arbitrations were done or some kind of ruling ...." Dep. at 62. To the extent that Plaintiff contends that he believed that the Division of Inspections would be a better job location, based on his testimony it would have been apparent to him shortly, if not immediately, after arriving there that this was not the case, see Dep. at 63-68. Thus, the period of time eligible for equitable

---

[24] The relevant portion of this testimony is reproduced at n.7.

tolling would be almost negligible.

As for the suggestion that Plaintiff did not file an administrative complaint because of fear of retaliation, Plaintiff has not pointed to any evidence in the record that this was the reason he did not timely file. Such contention appears untenable given that Plaintiff filed numerous grievances and two separate worker's compensation claims.

The First Circuit has cautioned that: "the baseline rule is that time limitations are important in discrimination cases, and that federal courts therefore should employ equitable tolling sparingly." Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d at 278; see also id. at 279 ("the federal standard reserves equitable tolling for exceptional cases"); Kelly v. NLRB, 79 F.3d 1238, 1247 (1st Cir. 1996)("[C]ourts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by statutory text.")(quoting Guidry v. Sheet Metal Worker's Nat'l Pension Fund, 493 U.S. 365, 376, 110 S.Ct. 680, 687 (1990))(alteration in original); cf. Earnhart v. Commonwealth of Puerto Rico, 691 F.2d 69, 71 (1st Cir. 1982) ("Courts have taken a uniformly narrow view of equitable exceptions to Title VII limitations periods."). Applying this law to the facts of the instant case, Plaintiff's plea for equitable tolling fails.

Accordingly, I find that Defendants' Motion for Summary Judgment should be granted as to Plaintiff's ADA claim (Count II) because of Plaintiff's failure to file a timely administrative claim. I so recommend.

**B. Satisfaction of Statutory Requirements**

Defendants argue that they also are entitled to summary judgment on Count II because Plaintiff's claimed impairment, "severe allergies," Dep. at 14, does not support a finding of disability subject to protection under the ADA, see Defendants'

Mem. at 6. Defendants contend that Plaintiff's own testimony negates any claim that his alleged medical impairment substantially affects any major life activity. See Defendants' Mem. at 8 (citing Dep. at 16, 18-21, 25-26). They also point out that Plaintiff admitted that by taking daily doses of medication he is able to mitigate the symptoms to allow him to work. Id. (citing Dep. at 17, 18, 21, and 22). Lastly, Defendants maintain that "the most the plaintiff can claim regarding his medical condition is that it interferes with working in certain locations." Id. at 9.

The ADA requires certain employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship ...." 42 U.S.C. § 12112(b)(5)(A). A "qualified individual with a disability," id., is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The term "disability" means:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

"To qualify as disabled under subsection (A) ... a claimant must initially prove that he or she has a physical or mental impairment." Toyota Motor Mfg., Kentucky, Inc., v. Williams, 534 U.S. 184, 194, 122 S.Ct. 681, 690 (2002). However, "[m]erely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment

limits a major life activity." Id., 534 U.S. at 195, 122 S.Ct. at 690. "Major" means important and refers to "activities that are of central importance to daily life." Id. at 197, 122 S.Ct. at 691. Examples of "major life activities ... include[] walking, seeing, hearing, and ... performing manual tasks." Id. at 195, 122 S.Ct. at 690 (quoting 45 C.F.R. § 84.3(j)(2)(ii) (2001))(internal quotation marks omitted).

Additionally, claimants are required to "prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial." Id. at 197, 122 S.Ct. at 691-92 (quoting 42 U.S.C. § 12102(2)(A)). The word "substantial" thus clearly precludes impairments that interfere in only a minor way with the performance of a major life activity. Id. at 197, 122 S.Ct. at 691.

The determination as to whether an individual is disabled should take into consideration any measures that mitigate his impairment. See Sutton v. United Airlines, Inc., 527 U.S. 471, 482-83 119, S.Ct. 2139, 2146-47 (1999)("A person whose physical or mental impairment is corrected by medication does not have an impairment that presently 'substantially limits' a major life activity.")(quoting 42 U.S.C. § 12102(2)(A)).

Lastly, whether an individual has a disability under the ADA is an individual inquiry. Id. at 483, 119 S.Ct. at 2147. It is not based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. Id.

Plaintiff testified that he is "allergic to about 21 different things ...." Dep. at 14. He identified mold, dust, dust mites, ragweed, trees, grass, dampness, mustiness, and weather changes as being among the things to which he is allergic. Dep. at 14-15, 22. The allergies cause a variety of

symptoms, including "runny nose, nosebleeds, congestion, watery eyes, headaches, sore throat ...," Dep. at 16, and "[i]f it gets worsened, it gets into infection, chest, can't breath, respiratory problems, rashes, earaches," id. Plaintiff was first diagnosed with these allergies when he was eleven. Id. at 14-15. He takes prescription medication daily, and he identified the prescription medication he was taking at the time of his deposition as Allegra. Id. at 16. Although Plaintiff stated that the medication can cause drowsiness and dry mouth, id. at 17, he agreed that these side effects did not affect his ability to work, see id. at 21.

Plaintiff further testified that he lives alone, id. at 19, that he does most of the chores around the house, id., that he does the housework, id., that he shops for food, id., that he cooks half of his meals and visits his parents for the other half, id. at 26, and that he does half of his laundry, id. His ability to perform manual tasks, such as lifting, is unaffected by his allergies, id. at 20. He can walk, see, and hear without problem. Id. He tries to work out regularly, id., utilizing free weights at home and going to a gym once or twice a week, id. At the gym, he does "a total fitness workout," id., which includes running, using various weight machines, id., and sitting in the steam room, id. at 20-21. Plaintiff acknowledged that he has the ability to garden, although he would "probably sneeze." Id. at 26.

In describing how moldy, musty, damp, and dusty conditions affect him, Plaintiff stated that he becomes susceptible to various symptoms, such as congestion and rashes, notwithstanding his regimen of Allegra. Id. at 22. He indicated that it is better for him to be where there is air conditioning. Id. at 23. Plaintiff acknowledged that his allergies would not prevent him from "working at any other jobs," id. at 24, unless the other

jobs involved exposure to dampness and mold, id. at 24-25. He agreed that he could work in a factory, in an office, or in a store provided they were well ventilated and not moldy or damp. Id. at 25.

Plaintiff testified that during the period that he was assigned to work in the basement of the police station (from 1995 to March of 1996, see Dep. at 56; see also VAC ¶ 45), he had "great difficulty going to that place everyday and then functioning an ordinary every day life," Dep. at 57. He stated that there were times when he would get up from his bed and faint, id. at 73, that he could not work out at the gym, id., and that he could not do his regular activities in the evening after being in the basement all day, id. Although he was able to walk during this period, Plaintiff testified that he could see only "[w]ith great difficulty," id. at 74, hear "[w]ith difficulty," id., and drive "[w]ith difficulty," id. He recounted that he had great difficulty performing his job duties and concentrating. Id. at 72. The symptoms were severe enough to cause him to cease working and apply for worker's compensation benefits. Id. at 72-73.

During the period Plaintiff was assigned to work in the Division of Inspections (from 2002 to April of 2005, id. at 22, 60), he developed skin rashes all over his body several times, id. at 64, 66, and experienced congestion, id. at 65, headaches, see Plaintiff's Mem., Attachment ("Att.") (Plaintiff's memo of 11/12/03),[25] nosebleeds (in the morning), id., and difficulty breathing, id. Plaintiff did not seek treatment for the rashes beyond mentioning the problem to his doctor who advised him to "take Alka-Seltzer Plus for it and to maybe put some ointment on it." Dep. at 66. The symptoms, however, interfered with

---

[25] The attachment to Plaintiff's Mem. which is dated 11/12/03 is unsworn.

Plaintiff's ability to sleep because it would take "the better part of the night to try to recuperate from the symptoms [he] had ...," id. at 65, with the result that he would only sleep from approximately two to six a.m., id., or for even shorter periods, see Plaintiff's Mem., Att. ("I am now averaging 2 hours of sleep a night ...."). In a November 12, 2003, memorandum to himself, Plaintiff recorded that it took up until 2:00 a.m. for his rash symptoms to diminish and that he was not able to perform his "usual life activity of going to the gym because of the fatigue and difficulty breathing caused by being in this moldy work location for 7 hours a day." Id. He also noted that "[d]uring the weekend after going to the gym my symptoms greatly reduce." Id.

The Court has already determined in Section I supra that Plaintiff's claims which are based on acts occurring prior to November 6, 2001, are time barred. As Plaintiff's work in the basement of the police station precedes this date, the adverse effects which he allegedly suffered as a result of working in that environment cannot be used in determining whether he is disabled under the ADA. Nevertheless, in the interest of completeness, in this section the Court analyzes Plaintiff's ADA claims without regard to the statute of limitations.

Accepting Plaintiff's testimony regarding the severity of the symptoms he experienced when he was assigned to work in the basement of the police station, especially that he could see only "[w]ith great difficulty,"[26] Dep. at 74, and that he was not able to perform his normal life activities in the evening after work, id. at 72, this case presents the question of whether a claim of

---

[26] Seeing is a major life activity. Land v. Baptist Med. Ctr., 164 F.3d 423, 424 (8th Cir. 1999)("major life activities are fundamental functions such as 'caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working'")(citing 28 C.F.R. § 36.104(2)).

disability which is location specific can constitute substantial interference with a major life activity.

Defendant asserts, and Plaintiff does not appear to dispute, that "[t]hose courts that have addressed a claim similar to plaintiff['s], that is location specific limitations, have uniformly held that such a limitation does not amount to a substantial interference with a major life activity." Defendants' Mem. at 9; see also Plaintiff's Mem. at 9-10. The Court's own research has uncovered no contrary holding.

The plaintiff in Block v. Rockford Public School District #205, Case No. 01 C 50133, 2002 U.S. Dist. LEXIS 244480 (N.D. Ill. Dec. 20, 2002), claimed to be disabled by virtue of asthma and allergies because they affected her breathing, a major life activity, id. at *6. However, the plaintiff testified that her breathing problems did not restrict her in any way except when she was at a particular high school. Id. At other locations, "one dose from her inhaler took care of her problems." Id. at *7. She could exercise, play sports, and go to school. Id. The court concluded that the plaintiff may have been substantially limited in her ability to attend class at one school, but that "this location specific limitation was not a substantial limitation on a major life activity." Id. at *7-8. The court granted summary judgment to defendant on plaintiff's ADA claim. Id.

The Eighth Circuit in Heilweil v. Mount Sinai Hospital, 32 F.3d 718, 724 (8th Cir. 1994), found that the fact the plaintiff's asthma prevented her from working in the basement of one of the hospital's buildings, which allegedly was poorly ventilated and subject to wide fluctuations in temperatures, did not substantially limit a major life activity. The plaintiff had claimed that after being transferred to the basement her asthmatic symptoms worsened and she began to suffer physical and

mental discomfort, including difficulty in breathing, wheezing and coughing, respiratory infections, bronchitis, headaches, tightness in chest, depression, and difficulty in sleeping. Id. at 720. However, when she stopped going to this location, plaintiff's health improved rapidly, id. at 723, and she was able to exercise and engage in swimming, id. In granting summary judgment to the hospital, the Heilweil court noted that "[a]n impairment which disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." Id.

Accordingly, based on Plaintiff's testimony that he would have no difficulty working in other locations, see Dep. at 24-25, I find that he has failed to demonstrate that he has a disability under the ADA. Therefore, Defendants should be granted summary judgment on this additional ground as to Count II, and I so recommend.

**IV. Intentional Infliction of Emotional Distress (Count III)**

In Count III, Plaintiff alleges that Defendants' actions amount to the intentional infliction of emotional distress. See VAC ¶¶ 79-81. "To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show 'extreme and outrageous conduct on the part of the defendant.'" Hoffman v. Davenport-Metcalf, 851 A.2d 1083, 1089 (R.I. 2004)(quoting Jalowy v. Friendly Home, Inc., 818 A.2d 698, 707 (R.I. 2003)(quoting DiBattista v. State, 808 A.2d 1081, 1088 (R.I. 2002))); see also Elias v. Youngken, 493 A.2d 158, 164 (R.I. 1985)(finding this standard applicable in the relationship between a supervisor and employee).

The Plaintiff must satisfy the very high standard set forth in the Restatement of Torts (Second) § 46 (1995) with respect to the necessary conduct to be proven. Hoffman v. Davenport-Metcalf, 851 A.2d at 1089.

> "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community*. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'." Jalowy, 818 A.2d at 707 (quoting Swerdlick v. Koch, 721 A.2d 849, 863 (R.I. 1998)[,] and Restatement (Second) *Torts*, § 46 cmt. *d* at 73).

Hoffman v. Davenport-Metcalf, 851 A.2d at 1089-90;[27] see also

---

[27] In an earlier opinion, Clift v. Narragansett Television L.P., 688 A.2d 805 (R.I. 1996), the Rhode Island Supreme Court noted the following explanation of the elements required for a claim of intentional infliction of emotional distress:

> Generally speaking, to establish a claim for intentional infliction of emotional distress, the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. Initially, the plaintiff must prove that the defendant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress. Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow.
>
> Second, the defendant's conduct must be extreme and outrageous. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress. Fourth, the emotional distress suffered by the plaintiff must be "so severe that no reasonable man could be expected to endure it." By circumscribing the cause of action with an elevated threshold for liability and damages, courts have authorized legitimate claims while eliminating those that should not be compensable.

Clift v. Narragansett Television L.P., 688 A.2d at 813 n.5 (quoting

Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1021 (1st Cir. 1988)("The 'extreme and outrageous' standard is a difficult one to meet .... [C]onduct that is intentional or reckless and causes severe emotional distress does not *ipso facto* constitute extreme and outrageous conduct; as Champlin [v. Washington Trust Co.] makes clear, 478 A.2d at 989, these are separate elements that must coincide to impose liability.").

A plaintiff must also allege and prove that medically established symptomatology accompanies the distress. Francis v. Am. Bankers Life Assurance Co. of Florida, 861 A.2d 1040, 1046 (R.I. 2004); see also Hoffman v. Davenport-Metcalf, 851 A.2d at 1089 ("[A] plaintiff must [also] prove physical symptomatology resulting from the alleged improper conduct.")(alterations in original); Clift v. Narragansett Television L.P., 688 A.2d 805, 813 (R.I. 1996)("We have recognized 'the right to recover damages by one who has been subjected to the intentional *or* the negligent infliction of mental distress as long as the distress [is] * * * *accompanied by physical ills.*'")(quoting Reilly v. United States, 547 A.2d 894, 896 (R.I. 1988)(alterations in original).

It is for the Court in the first instance to determine whether Defendants' alleged conduct could reasonably be regarded as so extreme and outrageous as to result in liability. Clift v. Narragansett Television L.P., 688 A.2d at 813 (affirming grant of summary judgment where defendant's alleged conduct as set out in the complaint could not reasonably be regarded as so extreme and outrageous to result in liability); see also Jalowy v. Friendly Home, Inc., 818 A.2d 698, 707 (R.I. 2003)("Whether conduct 'may reasonably be regarded as so extreme and outrageous as to permit recovery' for intentional infliction of emotional distress is a

---

Burbridge v. Paschal, 570 A.2d 1250, 1259-60)(N.J. Super. 1990) (quoting Buckley v. Trenton Sav. Fund Soc., 544 A.2d 857 (N.J. 1988))).

matter of law to be decided by a court, and if the court answers that question in the negative, it should grant judgment as a matter of law and dismiss such a claim.")(quoting Restatement (Second) Torts, § 46 cmt. h.); cf. Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1021 (1st Cir. 1988)(noting that "the court in Champlin appeared to treat the question whether conduct is sufficiently extreme and outrageous as one of law").

In the instant case, the conduct since 2001 which Plaintiff contends supports his claim for the intentional infliction of emotional distress includes: Defendants' refusal to recognize him as CPO, assigning him inappropriate clerical duties or no duties at all, subjecting him to very rigid treatment after he filed a grievance, disciplining him administratively on at least two occasions after he expressed his right to perform the duties of CPO, requiring that he punch-in and out for breaks, changing his job site to the Division of Inspections but requiring him to punch-in at the police station, placing him at the Division of Inspection despite knowing that the placement could exacerbate Plaintiff's allergies, and reducing his lunch to a half-hour lunch. Dep. at 32-33.

The alleged failure to provide Plaintiff with assignments which he believes fall within his job description is an issue which is presently under appeal to the Superior Court. While that court's long delay in rendering a decision is understandably distressing to Plaintiff, the fact that the arbitrator's award may yet be overturned and a new determination made regarding Plaintiff's claim that he is entitled to perform certain duties makes it difficult to describe Defendants' failure to assign him those duties as outrageous conduct. With reference to Plaintiff's move to the Division of Inspections, Plaintiff appears to have agreed to this change in locale. See Dep. at 62. While Plaintiff indicates that he "was forced to accept this

move," Plaintiff's Rule 12.1 Statement of Disputed Facts ("PSDF") #8, because of the "harassment, working conditions, numerous grievances, and the fact that the Superior Court hadn't rendered a decision in the 1999 arbitration ...," id., the fact that the transfer was at least discussed with Plaintiff (or his union) prior to being implemented and that he had the option of remaining at the police station (as uncomfortable as that location was, see Dep. at 62), diminishes its persuasiveness as evidence of the intentional infliction of emotional distress. Similarly, the resolution of the disciplinary actions by agreement, see Dep. at 37-39, without a determination as to their propriety, substantially detracts from their persuasiveness as evidence that Defendants' conduct was extreme and outrageous. As for the "very rigid ... treatment," Dep. at 33, requiring Plaintiff to punch-in and out for breaks, and shortening of his lunch hour, this conduct does not add significantly to Plaintiff's claim for intentional infliction of emotional distress.

Taking into consideration all of Defendants' conduct, I find that it is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Clift v. Narragansett Television L.P., 688 A.2d 805, 813 n.5 (R.I. 1996). An average member of the community, upon hearing a recitation of the facts alleged by Plaintiff to support this Count, would not have his resentment against Defendants aroused to the degree that it would cause him or her "to exclaim, 'Outrageous!'." Hoffman v. Davenport-Metcalf, 851 A.2d 1083, 1090 (R.I. 2004)(quoting Jalowy v. Friendly Home, Inc., 818 A.2d

698, 707 (R.I. 2003).[28] Accordingly, as a matter of law, Clift v. Narragansett Television L.P., 688 A.2d at 813, Plaintiff cannot succeed on his claim for intentional infliction of emotional distress. Defendants are entitled to summary judgment on Count III, and I so recommend.

**V. Punitive Damages (Count IV)**

Count IV does not plead a separate cause of action, but is a claim for punitive damages. As the Court has concluded that Defendants should be granted summary judgment as to Counts I, II, and III, they should also be granted summary judgment as to Count IV. I so recommend.

**Summary**

To the extent that Plaintiff's claims are based on acts occurring prior to November 6, 2001, they are time barred. Defendants are entitled to partial summary judgment as to such claims.

As for Plaintiff's individual causes of action, his § 1983 claim is barred because to the extent that he is alleging a violation of procedural due process he has not alleged in his VAC that he does not have a constitutionally adequate remedy under state law. His procedural due process claim is also barred because a remedy exists through the mechanism of his union's collective bargaining agreement, and he has availed himself of that remedy. Plaintiff's contention that this remedy is inadequate because of the delay in the Superior Court rendering a

---

[28] Having made this determination, it is unnecessary for the Court to consider whether Plaintiff has produced sufficient evidence to establish that he suffered physical symptomatology as a result of Defendants' allegedly improper conduct. See Francis v. Am. Bankers Life Assurance Co. of Florida, 861 A.2d 1040, 1046 (R.I. 2004)(stating that the tort of "intentional infliction of emotional distress require[s] that plaintiff allege and prove that medically established physical symptomatology accompany the distress"); Hoffman v. Davenport-Metcalf, 851 A.2d 1083, 1089 (R.I. 2004)(same).

decision on the Town's appeal of the arbitration award is unpersuasive in the absence of evidence that he has brought the delay to the attention of the Superior Court or has otherwise attempted to obtain a decision from that court. To the extent that Plaintiff claims a violation of his constitutional right to substantive due process, he is unable to satisfy the standard that Defendants' conduct "shocks the conscience."

Plaintiff's ADA claim (Count II) is barred because he failed to file a timely administrative claim. Even if such a claim were belatedly filed, the facts in the instant case do not qualify for application of the doctrine of equitable tolling. Plaintiff's ADA claim also fails because his disability is limited to specific locations and, therefore, it is not a substantial limitation on a major life activity.

Lastly, Plaintiff's claim for intentional infliction of emotional distress is barred because he cannot show "extreme and outrageous behavior" on Defendants' part. Accordingly, Defendants are entitled to summary judgment on all counts.

## Conclusion

For the foregoing reasons, I recommend that Defendants' Motion for Summary Judgment be granted. Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

David L. Martin

DAVID L. MARTIN
United States Magistrate Judge
September 1, 2006